# United States Court of Appeals
## For the First Circuit

No. 15-1543

NICOLE LANG,

Plaintiff, Appellant,

v.

WAL-MART STORES EAST, L.P.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya McCafferty, U.S. District Judge]

Before

Torruella, Lynch, and Thompson,
Circuit Judges.

Carole C. Cooke, with whom Heidi A. Nadel and Todd & Weld LLP
were on brief, for appellant.

Christopher B. Kaczmarek, with whom Jennifer M. Duke and
Littler Mendelson, P.C. were on brief, for appellee.

March 2, 2016

**THOMPSON**, <u>Circuit Judge</u>.

## OVERVIEW

Nicole Lang once worked for Wal-Mart Stores East, L.P. While there, she claimed a disability arising from her "pregnancy status," though she insisted that she could perform the essential functions of her job with a reasonable accommodation. Seeing things differently, Wal-Mart refused her accommodation request. And then, later on, Wal-Mart terminated her.

Lang eventually sued, claiming violations of the federal Americans with Disabilities Act (popularly known as the "ADA") and the New Hampshire Civil Rights Act. After discovery, the district judge granted Wal-Mart summary judgment on all claims. The judge's fairly-lengthy ruling failed to convince Lang. But for reasons we explain later, we think that summary judgment is called for — which leads us to affirm.

## HOW THE CASE GOT HERE

Taking all disputed facts in the light most sympathetic to Lang (as the party opposing summary judgment), <u>see</u> <u>Soto-Padró</u> v. <u>Pub. Bldgs. Auth.</u>, 675 F.3d 1, 2 (1st Cir. 2012), we believe the competent summary-judgment evidence tells the following tale.

Sometime in July 2010, Lang became an "unloader" at Wal-Mart's distribution center in Raymond, New Hampshire. An unloader (as the name implies) unloads merchandise hauled to the center in

tractor trailers.  Wal-Mart's job-description form says that the "essential functions" of an unloader include "unloading freight from trailer manually or with power equipment."  But the form also adds that "[m]ov[ing], lift[ing], carry[ing], and plac[ing] merchandise and supplies weighing up to 60 pounds without assistance" are "physical activities . . . necessary to perform one or more essential functions of this position."  Asked at her deposition whether Wal-Mart "expected [her] to be able to lift . . . up to 65 pounds" by herself, Lang said "yes."  That jibes with this statement by the center's distribution manager, who said that unloaders are required to "lift[] merchandise or supplies weighing up to 60 pounds without assistance."

Wal-Mart randomly assigns unloaders to trailers — usually one unloader per trailer, about 20 unloaders per shift — in a way so that the "oldest" trailer gets unloaded first.[1]  Some freight — typically freight weighing more than 65 pounds (furniture, for instance) — is labeled "team lift," meaning the

---

[1] Lang suggests that "[t]he trucks were assigned by a supervisor or another associate who would go through the stack, look at it, and then hand Lang the assignment he wanted her to have."  But that claim is not inconsistent with a randomized-assignment policy.  And to the extent that her deposition or affidavit could be understood as disputing the randomized-assignment policy, it is mere speculation without sufficient personal knowledge about the policy — which is not enough to forestall summary judgment.  See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).

assigned unloader needs to have another unloader (and possibly more) help out. Most freight has no label or marks indicating its weight, however. So unloaders often do not know the freight's weight before lifting it, though the record is uncontested on the point that the great majority of freight weighs more than 20 pounds.

Unloaders occasionally use forklifts and other power equipment to unload some trailers — like when the trailers have merchandise stacked on pallets. We say "occasionally use" and "some trailers" for several reasons. One is that cargo frequently shifts in transit, breaking the pallets and forcing unloaders to remove items by hand. A second is that if an unloader spills cargo while using power equipment, she would then have to pick up the spilled cargo by hand. A third is that many vendors try to pack as much merchandise into the trailers as humanly possible, the result being that many trailers — including what the parties call "RBD" trailers — have cargo stacked from floor to ceiling. And unloaders must unload these trailers by hand, a time-consuming process, to be sure. All and all, according to the unrebutted affidavit of the operations manager at this Wal-Mart center, about "70% of the trailers require some degree of manual labor to unload them."

In late September 2010 — about two months after becoming an unloader — Lang learned that she was pregnant. Her doctor told her on October 7 not to lift anything over 20 pounds. Convinced that her bosses at Wal-Mart would have a problem with a 20-pound restriction, Lang asked the doctor if "we [could] just hold off on the note." The doctor said okay — but added, "don't lift" anything over 25 pounds.

A week or two later — still in October 2010 — Lang told her manager, Brian Hug, about the pregnancy and the lifting restriction. Hug was "excited" to hear about the pregnancy ("excited" is the word Lang used in her deposition). Hug asked her if she had a doctor's note, to which she answered "no." Lang did not ask Wal-Mart to accommodate her condition at that time. Instead she kept on doing her regular unloader duties, including lifting — though she later recalled getting more RBD trailers than usual to unload, and she sometimes had to ask other unloaders to help her.

On November 7, 2010, Lang pulled a muscle lifting a heavy, unmarked box. As for which muscle, she said in her interrogatory answers that she had pulled a "groin muscle"; later at a deposition she said that she had pulled a muscle in her "uterus"; and still later in court papers she said again that she had pulled a "groin muscle." Anyway, Lang told Hug about the pull

that day, November 7. Hug brought her to the center's first-aid office. And someone from Wal-Mart's human-resource department — Bridget Ronaghan — drove Lang home, though Ronaghan made a point of telling her that her "pregnancy was a liability" and that she should ask for leave under the federal Family Medical Leave Act ("FMLA"). Lang's doctor told her to take some Excedrin, soak in a tub, and ice the injured area.

Lang felt "fine" (her word) the next day. But Wal-Mart told her to take the day off. That same day, November 8, Lang's husband — also a Wal-Mart employee — asked the human-resource manager, Andrea Rose, if Lang could get reassigned to a less-demanding post (sweeper, cleaner, etc.) or if she could just unload non-RBD trailers with a forklift. Rose refused, saying "if I had to accommodate [her], I'd have to accommodate the rest."

After talking with a lawyer at the New Hampshire Commission for Human Rights ("NHCHR," for short), Lang formally asked Wal-Mart for an accommodation near the end of November 2010. On the request-for-accommodation form, she listed "pregnancy" as her "condition or impairment." And the medical questionnaire filled out by her doctor said that she could not lift more than 20 pounds. As for an accommodation, Lang asked Wal-Mart to either assign her to "trailers that don't need to be unloaded by hand," or to give her a "job that doesn't deal with lifting over 20

pounds." But Wal-Mart said no, concluding that her pregnancy "is considered temporary" and so "not eligible for an accommodation." Wal-Mart also added that the lifting restrictions imposed by her doctor "prevent [her] from performing the essential functions" of her job. Lang did two things in response: First, she asked for permission from Wal-Mart to take FMLA leave of absence through June 18, 2011. And even though she would exhaust her FMLA leave rights by the end of December 2010, Wal-Mart approved the full leave amount. Second, while on leave, she filed a charge of discrimination with the NHCHR, alleging (as relevant here) that Wal-Mart had discriminated against her because of her "pregnancy status" and had failed to reasonably accommodate her "medical disability." Rose knew about Lang's NHCHR complaint, Lang tells us, though she does not tell us what the NHCHR did with her discrimination charge.

Lang gave birth to a son on June 15, 2011. After taking a six-week maternity leave, she returned to work as an FID Processor (Wal-Mart had given her unloader position to someone else). Her new job required her to (a) use a forklift to bring pallets of cargo to designated areas; (b) scan and label the cargo boxes; and (c) then put the boxes on a conveyor belt. Supervisors kept "eyeing" her as she did her FID-Processor duties, however, like she was doing "something wrong" — conduct that made her feel

- 7 -

"uncomfortable." Adding to her belief that Wal-Mart was "targeting" her, some higher-ups there (a) saw her talking to an associate at work and told her not to speak with other workers; (b) occasionally had her repeat tasks, e.g., re-dusting an area she had already dusted — though she conceded that sometimes the request made sense, like the time someone from corporate was coming to visit and her bosses wanted everything to look clean; and (c) took days to finally approve her request for extra time so that she could use her breast pump during breaks.

In mid-November 2011, Lang hurt her arm while putting a box on the conveyor belt. She told a supervisor about what had happened. And the supervisor asked whether she was "joking." Another Wal-Mart manager brought her to the hospital, where a doctor diagnosed her with a pinched ulnar nerve, gave her a brace, and told her to ice her arm and take ibuprofen. Consistent with its workers' compensation procedure, Wal-Mart gave Lang a "temporary alternative duty" assignment (involving dusting), which would allow her to work while she recovered — if she could not return to her regular job after 90 days, Wal-Mart would place her on workers' compensation.

About a month later, in December 2011, Lang still had arm pain. So human-resource manager Rose — without consulting Lang — placed her in another temporary alternative duty position,

this one involving label sorting. According to Lang's deposition, Rose "felt like if she extended my [light duty] that I'd keep my income."

Lang and her husband had long wanted to move to Florida. And Rose had known about the couple's wish to move there since at least November 2011. In February 2012, Lang's husband asked for and received a transfer to a Wal-Mart distribution center in the Sunshine State. Wal-Mart, though, apparently had a policy prohibiting persons on temporary alternative duty assignments from transferring — meaning Rose's unilateral decision extending Lang's assignment effectively blocked Lang's ability to transfer to Florida with her husband. Lang then got permission to take an unpaid two-week leave from work to receive medical care for her arm injury. And with that leave in place, the Langs moved to Florida at the end of February.

Around this time Lang received notice that her claim for workers' compensation was (in all capital letters) "hereby denied by employer or [insurance] carrier." "No causal relationship to employment" was the reason listed, though the notice added that "extent of disability [was] questionable." Denise Kondor's name appears on the form, on the line provided for "Authorized Representative." And National Union Fire Insurance Company is listed as the "Insurance Carrier." Lang's affidavit stated that

Kondor worked as a claims adjuster for a company called "Sedgwick" and that "Sedgwick" had "denied my workers' compensation request." Lang, however, points us to nothing in the record explaining whether she ever contested the denial of her workers' comp claim.

Jumping to April 2012, we see that Rose, relying on corporate policy, asked Lang to submit medical documentation to support the leave. But Lang had trouble finding a Florida physician willing to treat her and sign the Wal-Mart-required forms, because the carrier would not acknowledge liability for her medical bills. So Wal-Mart extended her leave to August 13, 2012, to give her more time to locate a doctor. Rose, though, had no sympathy for Lang, telling her that she (Lang) had put herself in this position. After Lang failed to submit the necessary forms by the August deadline, Wal-Mart terminated her, with Rose processing the termination as a "voluntary quit" — which, Rose later confirmed, made Lang "eligible for re-hire by Wal-Mart."

Disappointed, Lang sued Wal-Mart in New Hampshire federal court. Pertinently, she alleged that Wal-Mart had failed to accommodate her disability arising "from her pregnancy status," in violation of the ADA. She also alleged that Wal-Mart had discriminated against her because of her disability and had retaliated against her because of her accommodation request and her NHCHR complaint, all in violation of New Hampshire law.

Following discovery — during which Lang filed an affidavit saying in part that "[t]he only essential functions of the Unloader position that [she] could not perform had to do with weight" — Wal-Mart asked the judge for summary judgment on all claims. Lang opposed, conceding that "Wal-Mart's job description for Unloader requires an employee to have the ability to move, lift, carry and place merchandise and supplies of up to a maximum of 60 pounds without assistance," but insisting that Wal-Mart should have reasonably accommodated her by placing her "in another suitable position."

Hoping to nail Lang's essential-functions argument down, the judge said during argument on the motion that "moving, lifting, etc., up to 60 pounds without assistance" is "an undisputed description" of the job's "essential function[s]." So, the judge added, turning to Lang's lawyer, "[y]ou're saying make some accommodation which would enable [Lang] to perform this 60-pound weight limit, but what you're essentially saying is she can't lift anything more than 20 pounds." Lang's lawyer responded, "[c]orrect." "[T]hat takes it into a totally different type of job," the judge pointed out. "Perhaps," Lang's attorney said, though she faulted Wal-Mart for not engaging in an interactive process to come up with an accommodation. And Lang's lawyer

- 11 -

stressed a little later that "the job description is not in dispute."[2]

The judge later issued a thorough opinion jettisoning Lang's ADA failure-to-accommodate claim because (in the judge's view) the record did not establish that (a) Lang had a disability within the ADA's meaning; that (b) she could perform the job's essential functions, either with or without a reasonable accommodation — "[i]t is undisputed," the judge wrote, that lifting items "weighing up to 60 pounds was an essential function" of her job and that she "submitted paperwork from her doctor indicating that she could not lift items weighing more than 20 pounds"; or that (c) her requested accommodations were reasonable. And since Lang had not put enough in the record to show either that she had been disabled under the ADA or that she could perform essential job functions, the judge knocked out the state-law discrimination claim too. Wrapping up, the judge concluded that the summary-judgment materials did not establish either that there was a causal connection between her protected conduct (her reasonable-accommodation request and NHCHR complaint) and Wal-Mart's adverse action (terminating her) or that Wal-Mart's rationale for her

---

[2] Lang has a different lawyer on appeal, by the way.

- 12 -

termination was pretextual — which led the judge toss out her state-law retaliation claim as well.

Lang later asked the judge to reconsider the summary-judgment ruling. Once again conceding — as the judge had found — "that lifting 60 pounds was an essential function of [her] job as an Unloader," Lang claimed that the judge had botched matters in two ways: first, by relying on caselaw predating critical amendments to the ADA's "disability" definition, and, second, by overlooking that Wal-Mart had never devised a suitable accommodation through an "interactive process" with her. But the judge stuck to her guns, ruling that the ADA amendments did not affect her summary-judgment conclusion and that Wal-Mart had no obligation to engage in an interactive process because Lang did not have an ADA disability. Lang then appealed to us.

## SUMMARY-JUDGMENT STANDARD

We give de novo review to the judge's grant of summary judgment, drawing all reasonable inferences in Lang's favor and affirming if no "genuine dispute as to any material fact" exists and Wal-Mart merits judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 92 (1st Cir. 2014). Because our review is de novo, we can affirm on any ground appearing in the record — including one that the judge did not rely on. See, e.g., Collazo-Rosado, 765 F.3d at 92.

- 13 -

## ADA CLAIM

The ADA forbids a covered employer (which all agree Wal-Mart is) from discriminating against a "qualified individual," see 42 U.S.C. § 12112(a), relevantly defined as a person "who, with or without reasonable accommodation, can perform the essential functions" of her job, see id. § 12111(8).  Failing to reasonably accommodate a disabled person is a form of disability discrimination, of course.  See, e.g., Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010).  And — as the judge correctly noted — to survive an adverse summary judgment on a failure-to-accommodate claim, a plaintiff must point to sufficient evidence showing that (a) she is disabled within the ADA's definition; that (b) she could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of her disability, yet failed to reasonably accommodate it.  See, e.g., Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).

Lang and Wal-Mart spar over every prong.  But we begin — and end — with the essential-functions issue (i.e., we assume without deciding that Lang had an ADA disability), noting that while the employer bears the burden of showing that a fought-over job function is essential, see Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000), the employee bears the burden of showing that she could perform that function, even if

- 14 -

only with some reasonable accommodation for her disability, see Jones v. Walgreen Co., 679 F.3d 9, 17 (1st Cir. 2012).

Recall how Wal-Mart's job-description form lists "unloading freight from trailer manually or with power equipment" as an unloader's essential job function, and then adds that "[m]ov[ing], lift[ing], carry[ing], and plac[ing] merchandise and supplies weighing up to 60 pounds without assistance" are "physical activities . . . necessary to perform one or more essential functions of this position."  Without evincing any sense of irony, Lang blasts the judge for concluding that manually lifting up to 60 pounds is an essential job function for an unloader — as she now sees things, an unloader's essential function is not manually lifting items weighing up to 60 pounds but getting cargo off trailers, a task one can do by hand or with power equipment.

We see irony because (as we have taken pains to emphasize) Lang's lawyer told the district judge and opposing counsel — not once, not twice, but three times (in the summary-judgment opposition, during argument on the motion, and in the motion for reconsideration) — that no one disputes that lifting up to 60 pounds without assistance is (repeat, is) an essential job function; statements, remember, that came after Lang had answered "yes" to a deposition question about whether Wal-Mart expected her to lift "up to 65 pounds" on her own.  Representations like the

- 15 -

ones made by Lang's lawyer — "an officer of the court" — are "solemn undertaking[s], binding on the client." Genereux v. Raytheon Co., 754 F.3d 51, 58 (1st Cir. 2014) (quoting CCM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995)). And once made, neither the lawyer nor her "clients can complain when the trial court takes them at their word." Id. at 59. The bottom line, then, is that team Lang cannot forsake its earlier concessions, switching "horses midstream" to offer an entirely new take on the essential-functions issue — a take that is completely inconsistent with her earlier position. See id.

Citing National Association of Social Workers v. Harwood, Lang notes that we can choose to consider an argument not raised below; the choice is totally up to us, meaning she has no entitlement to that bonanza, and only in "extraordinary" circumstances — "few and far between" — will we relax the time-tested raise-or-waive rule. See 69 F.3d 622, 627-28 (1st Cir. 1995) (deciding a "new" issue that was (among other things) of constitutional importance, threatened a miscarriage of justice if not considered, and lent itself to satisfactory decision on the existing record without any need for further fact development). Nothing about our situation screams "extraordinary" — what with Lang's lawyer having conceded below at every turn that lifting up to 60 pounds without help is an essential job function. And that

- 16 -

means that Lang's case plainly falls within the general raise-or-waive rule, not within the seldom-seen exception to it.  See id.

Shifting gears, Lang claims that a jury, given all the evidence, could fairly conclude that she could have performed essential unloader functions had Wal-Mart reasonably accommodated her either by (a) assigning her only to trailers that did not require unloading by hand or by (b) transferring her to a vacant position that did not require her to lift up to 60 pounds.  And she criticizes the judge for ruling otherwise.  But we think the judge got it right.

As we just discussed, lifting up to 60 pounds manually is — on this record and at this stage — an essential function for unloaders.  So Lang's first proposed accommodation — excusing her from manual lifting — is a non-starter, and for a simple reason. What she really wanted was for Wal-Mart to excuse her from having to perform an essential function.  But under the ADA, an employer is not required to accommodate an employee by exempting her from having to discharge an essential job function.  See, e.g., Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 81 (1st Cir. 2010); see also Mulloy v. Acushnet Co., 460 F.3d 141, 153 (1st Cir. 2006) (explaining that a proposed accommodation that "redefin[ed]" an employee's job description is "per se unreasonable").

As for her other suggested accommodation — reassigning her to a vacant position that did not require her to lift up to 60 pounds — Lang offered no evidence that there were any vacancies when she asked for an accommodation, and it was her burden to show as much. See Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001) (noting that a "[r]easonable accommodation may include reassignment to a vacant position," and stressing that the employee "bears the burden of proof in showing that such a vacant position exists" (internal quotations and citations omitted)). Lang begs to differ on whether she met her burden, pointing out two things.

For openers, she notes that her affidavit named three women whom Wal-Mart transferred to less labor-intensive positions after they had become pregnant. Wal-Mart protests that this is all hearsay evidence — and one cannot fend off summary judgment with inadmissible hearsay, Wal-Mart reminds us. See, e.g., Dávila v. Corporación De P.R. Para La Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007) (stressing that "[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment"). But even putting the hearsay question aside, we agree with the judge that the affidavit is not enough to stave off summary judgment. That is because Lang's affidavit did not mention the specific circumstances of the transfers — the document said nothing about the essential functions of the jobs in question, the timing of the

- 18 -

trio's transfers, the availability or not of a similar job when Lang made her accommodation request, etc. And absent information of this sort, the affidavit could not help create a fact issue about whether — to quote Lang's brief — "a transfer would have been feasible" for her.

Next, Lang plays up how Wal-Mart placed her in a less physically-demanding position — the FID-Processor position — when she returned from maternity leave. But that is not enough for her to get to a jury on this issue, because she presented no evidence that Wal-Mart had an open FID-Processor job (or any other light-duty job) when she made an accommodation request, eight months earlier — and employers like Wal-Mart are not obliged to create a job opening so a disabled employee can work. See Phelps, 251 F.3d at 27.

In a last ditch effort to save her ADA claim, Lang argues that we must reverse the grant of summary judgment, because Wal-Mart did not engage in an "interactive process." Sure, an employee's accommodation request can "sometimes" trigger a duty on the employer's part to talk with the employee, with the goal of finding a way to reasonably accommodate her disability. See, e.g., EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014). But here is the problem for Lang: the "omission" of an interactive process "is of no moment if the record forecloses a

finding" that the employee could do the essential "duties of the job, with or without reasonable accommodation," see Kvorjak v. Maine, 259 F.3d 48, 53 (1st Cir. 2001) — which, for reasons already given, is the case here.  Thus Lang's interactive-process argument comes up short.

The net result of all this is that because Lang failed to create a trialworthy issue as to whether she could have performed an essential function of her job — manually lifting up to 60 pounds — with or without a reasonable accommodation, the judge rightly granted summary judgment to Wal-Mart on the ADA claim.

So on to the state-law claims we go.

**STATE-LAW CLAIMS**

**Reader Alert**

As we mentioned a few pages ago, Lang also brought state-law claims of unlawful disability discrimination and retaliation against Wal-Mart, see N.H. Rev. Stat. Ann. §§ 354-A:7 (discrimination), 354-A:19 (retaliation) — claims that the judge likewise booted out on summary judgment.  Lang asks us to reverse. But before weighing in, we must make a short detour to make a couple of observations.

The parties — who fight like mad on most issues — actually do agree on a few things.  Like the judge, they assume

- 20 -

that because Lang essentially seeks to craft her state-law discrimination and retaliation claims from indirect evidence, a federal court must analyze these claims using the burden-shifting regime devised by our Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) — more on this regime later. Like the judge, they also assume that New Hampshire and federal courts apply McDonnell Douglas the same way. And like the judge, they assume that the prima-facie elements for discrimination and retaliation claims are the same under state and federal law — more about these elements in a bit. Anyhow, these are all legally-intricate issues, involving a dizzying array of jargon-filled statutes (with the federal and state statutes not always matching up word for word) and caselaw.[3] And we wonder whether state and federal law perfectly align on every issue. Still, following the judge's and the parties' lead, we too will assume — **without holding** — that New Hampshire law is as they say it is.

With these words of caution, we trudge on.

### Burden-Shifting Explained

Under the McDonnell Douglas regime, Lang must first establish the prima-facie elements for both discrimination and

---

[3] Deciding what New Hampshire's disability statute requires is a state-law statutory-interpretation question, naturally — but it is a question neither party raises.

retaliation (we will say what those elements are shortly).  See In re Seacoast Fire Equip. Co., 777 A.2d 869, 872 (N.H. 2001).  If she does, Wal-Mart must offer a legitimate, nondiscriminatory reason for the complained-about action.  See id.  And if Wal-Mart satisfies its burden, Lang must then show that the reason is pretextual, see id. — though "a reason cannot be proved to be [pretextual] unless it is shown both that the reason was false, and that [a prohibited criterion] was the real reason," see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).[4]  On this last point, we see that

> [t]he factfinder's disbelief of the reasons put forward by the [employer] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the [employer's] proffered reasons will permit [, though not compel,] the trier of fact to infer the ultimate fact of intentional discrimination, and . . . no additional proof of discrimination is required.

In re Seacoast Fire Equip. Co., 777 A.2d at 873 (quoting St. Mary's Honor Ctr., 509 U.S. at 511) (all but the first alteration in original).

_____

[4] See also Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 335 (1st Cir. 1997) (quoting St. Mary's Honor Ctr.); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (stating that "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive" (internal quotations omitted)).

Time to roll up our sleeves and delve into the discrimination and retaliation issues.

### Discrimination

Proceeding (as we said we would) on the arguendo assumption that Granite State disability-discrimination law parallels federal law, we take the prima-facie elements as argued to us: i.e., that Lang (at step one in the McDonnell Douglas analysis) must show that (a) she was disabled as defined by the ADA; that (b) she was qualified to do the essential functions of her job with or without a reasonable accommodation; and that (c) she suffered an adverse-employment action "in whole or in part because of [her] disability." See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012).

"The simplest way to decide a case is often the best," we have noted. Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (quoting Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998) (R. Arnold, J.)). And that is true here: Zeroing in on prima-facie element (b), we easily conclude that Lang's discrimination claim fails because, as we have already seen, the summary-judgment record does not show that she could perform the essential function of her job — manually lifting up to 60 pounds — with or without a reasonable accommodation. In other words, what we have said about her ADA claim disposes of her

discrimination claim at the first step of McDonnell Douglas (a.k.a,

the prima-facie step) — so we need not run through the rest of the

burden-shifting test.

One state-law claim down, one to go.

**Retaliation**

Again indulging the judge's and the parties' assumption

that New Hampshire law on retaliation claims like Lang's mirrors

federal law, we take the prima-facie requirements as presented to

us (without of course suggesting whether this is — or is not — an

accurate statement of state law): i.e., that Lang must show that

(a) she engaged in protected activity; that (b) a materially-

adverse action by the employer followed; and that (c) a causal

link exists between the two. See Calero-Cerezo v. U.S. Dep't of

Justice, 355 F.3d 6, 25 (1st Cir. 2004).[5]

To simplify matters we assume for argument's sake that

Lang established a prima-facie case — i.e., that (a) her

accommodation request and NHCHR filing constitute protected

activity; that (b) her termination qualifies as an adverse-

employment action (termination is the adverse-employment action of

which she complains); and that (c) a causal link connects these

events. And we assume too that Wal-Mart, in turn, offered a

---

[5] Calero-Cerezo is the case the judge quoted and Lang relies on.

legitimate, nonretaliatory reason for the termination — i.e., her failure, despite repeated requests, to provide the required medical papers to support her leave (she does not really challenge the idea that a failure of that sort could constitute an above-board reason for the termination).

So, having assumed without deciding that Lang satisfied the first step of McDonnell Douglas (establishing a prima-facie case of retaliation) and that Wal-Mart satisfied the second step (providing a permissible, nonretaliatory reason for the termination), we are left with the third step and the question of pretext. To reach trial on her retaliation claim, Lang must show that Wal-Mart's given reason for the termination amounted to a pretext for unlawful retaliation — bearing in mind (as we said) that "a reason cannot be proved to be 'a pretext for [retaliation]' unless it is shown both that the reason was false, and that [retaliation] was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)).

In trying to show this, Lang does not deny that Wal-Mart's stated reason had a basis in fact: she concedes — or at least does not contest — that she never turned over the requested

documents, a violation that is a terminable offense.[6]  And she does not argue that Wal-Mart treated similarly-situated violators of similarly-serious work rules differently, keeping them — but not her — on the payroll.[7]  Instead she contends that a jury could infer pretext and retaliatory termination in either of two ways — or both:

The first way is fairly complicated, involving several parts.  Bear with us now, please, as we go through them.[8]

- Part 1 — Wal-Mart either denied her workers' comp claim on its own or pushed the carrier to deny it.

- Part 2 — Wal-Mart extended Lang's light-duty assignment, forcing her to take an unpaid leave so that she could transfer to Florida with her husband (Wal-Mart, she reminds us, had a policy of not transferring employees on light duty).

---

[6] Cf. Mesnick, 950 F.2d at 824 (declaring that "[i]n assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible" (internal quotations and citation omitted)); id. at 828-29 (holding that statutes banning "retaliation for exercising rights guaranteed by law" do not, for example, "'clothe the complainant with immunity for past and present inadequacies'" or for "'unsatisfactory performance'" (quoting Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988))).

[7] Cf. García v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (noting that one can show pretext "by producing evidence that [the] plaintiff was treated differently from similarly situated employees").

[8] Fyi:  The quotes to come are from her brief.

- **Part 3** — Wal-Mart insisted that she have a Florida doctor fill out forms to verify the need for the leave, even though no doctor would treat her "work-related injury" and sign the required forms, all because the carrier had refused to "acknowledge its liability for her medical bills" (given the claim denial).

- **Part 4** — Having "created a situation that Lang could not escape from," Wal-Mart then used her failure to send the forms as a pretext for "fir[ing] an annoying employee who asserted her rights under the ADA too often."

For simplicity, we will refer to this as the "Wal-Mart-contrivance theory."

The second way is more straightforward. As Lang sees it, comments by Rose and Ronaghan (discussed again below) reveal animus, giving rise to an inference that Wal-Mart came up with a phony explanation for the termination — that retaliation was the real reason behind Wal-Mart's decision. For convenience, we will refer to this as the "improper-comments theory."

Though we give Lang points for creativity, her arguments just do not work.

### Wal-Mart-Contrivance Theory

It should go without saying — but we say it anyway — that a party cannot ward off summary judgment with "proffers that

depend . . . 'on arrant speculation, optimistic surmise, or farfetched inference.'" See Fragoso v. López, 991 F.2d 878, 887 (1st Cir. 1993) (quoting Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991)). Yet that is all Lang gives us here.

Take the denial of her workers' comp claim (part 1 of her multipart theory). Lang's thesis is that Wal-Mart — driven by retaliatory rage — nixed that claim on its own or in concert with the carrier. For evidence of this theory, she points to one of her answers to interrogatories, which states that Rose spoke "one on one" with Lang's doctor and with the claims adjuster. Surely, she argues, these chats show that something sinister was afoot during the workers' comp process — which (as she tells it) suggests that (a) Wal-Mart had it in for her ever since her accommodation request and NHCHR filing and that (b) Wal-Mart pounced on her failure to file the required forms to mask its illegal motive for getting rid of her.

The stumbling block for Lang is that she highlights no evidence on what the participants talked about during those "one on one[s]" — she, for instance, directs us to no discovery (e.g., a deposition of Rose) that pins down whether what Rose said was sinister (goading the adjuster or the carrier into denying Lang's claim) or benign (giving the adjuster Lang's basic employment info, like when she started working for Wal-Mart and what her job duties

- 28 -

were).  What Lang hopes to do is to close a chasmal gap between her retaliation theory and proffered facts by floating the sinister possibility.  But to escape summary judgment, she must deal in what is "probable," not just in what is "possible"; "[s]imply allowing for a possibility" — our cases say — "does not make it more likely than not that the possibility happened."  See Tropigas de P.R., Inc., 637 F.3d at 58.  At best for Lang, her interrogatory answer about the tête-à-têtes may "fuel speculation" that Wal-Mart's Rose might have pushed the carrier to deny the workers' comp claim (which, again, is one of Lang's hunches for what might have happened), but that is "insufficient" to establish a triable issue for the jury, see id. — after all, and as we have already pointed out, a litigant like Lang "who bears the burden of proof on an issue cannot defeat summary judgment by relying on speculation about the facts," Cahoon v. Shelton, 647 F.3d 18, 27 n.6 (1st Cir. 2011); see also Tobin v. Fed. Express Corp., 775 F.3d 448, 452 (1st Cir. 2014) (emphasizing that "[s]peculation about mere possibilities" will not stop summary judgment).  So despite Lang's best guesswork, the denial of her workers' comp claim does not allow a jury to make a rational, nonconjectural finding that Wal-Mart's given reason for her termination was a pretext for retaliation.  See generally Curran v. Dep't of Justice,

813 F.2d 473, 477 (1st Cir. 1987) (holding that "[g]uesswork" has "no place" in the summary-judgment "calculus").

Now consider Rose's decision to extend Lang's light-duty work (part 2 of her multipart theory). That decision suggests illegal animus on Wal-Mart's part because Rose made that call solely to stop Lang from transferring to the Everglade State — or so the argument goes. But in her deposition, Lang herself said that she thought Rose believed that "if she extended my [light duty]" then "I'd keep my income," which is hardly suggestive of a forbidden motive — at least Lang spends no time explaining how it is. Ultimately, Lang's inability to highlight "definite" and "competent" evidence supporting this aspect of her animus theory proves to be her undoing. See Mesnick, 950 F.2d at 822 (declaring that "[o]n issues where" the summary-judgment opponent "bears the ultimate burden of proof," she "must present definite, competent evidence to rebut the motion"); see also Pérez v. Lorraine Enters., Inc., 769 F.3d 23, 29-30 (1st Cir. 2014) (ditto).

With parts 1 and 2 of the Wal-Mart-contrivance theory out of the way, Lang's entire multipart argument falls like a house of cards. Enough said on that.

### Improper-Comments Theory

Unfortunately for Lang, her improper-comments theory does not hold together, either. Start with Ronaghan's comment —

- 30 -

that Lang's "pregnancy was a liability" and that she should "apply for FMLA" leave (leave that she did apply for and get, for what it is worth): Ronaghan made this comment in November 2010, while Lang got terminated in August 2012. And Lang never explains how a statement that preceded her termination by nearly two years has any value in support of her retaliation charge. On top of that, there is no evidence that Ronaghan played a part in the termination decision — Lang speculates that Ronaghan could have "influence[d] the decisionmaker (Rose) because [Ronaghan] worked in the human resources department with Rose," but more than speculation of this sort is required to save her from summary judgment. See, e.g., Cahoon, 647 F.3d at 27 n.6; Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (making clear that "conclusory allegations, improbable inferences, and unsupported speculation" cannot block summary judgment). Consequently Ronaghan's remark cannot give rise to an inference that Wal-Mart's termination reason was a pretext hiding a retaliatory motive.

Nor can Rose's comments — that (a) "[i]f I had to accommodate you [Lang], I'd have to accommodate the rest" and that (b) Lang had put herself in the position of being unable able to find a doctor to sign the required forms: Again, the record does not show that Lang was a "qualified individual" with a disability, i.e., one who could have performed the essential functions of her

- 31 -

job with or without a reasonable accommodation.  And Lang never convincingly explains why statement (a) — basically expressing worry that accommodating one nonqualified person may require Wal-Mart to accommodate others — shows that Wal-Mart's termination explanation was merely a pretext disguising retaliatory animus. So too with statement (b):  she never persuasively explains why Rose's putting-yourself-in-that-position comment is sufficient proof that Wal-Mart's termination rationale camouflaged illegal retaliation, given how the Langs did voluntarily move to Florida while Lang's health and job status were still very much up in the air.

With that and at long last, we affirm the grant of summary judgment on the retaliation claim.

## WINDUP

Having reviewed Lang's claims with care, we uphold the entry of summary judgment for Wal-Mart.

**Affirmed**.