STATE OF MAINE                                    SUPERIOR COURT
YORK, ss.                                         Civil Action
                                                  DOCKET NO. CV-16-0011


DEBRA OUELLETTE                  )
                                 )
          Plaintiff,             )
                                 )              **ORDER ON DEFENDANT'S**
     v.                          )              **MOTION FOR SUMMARY**
                                 )              **JUDGMENT**
HANNAFORD BROS CO., LLC,         )
                                 )
          Defendant.             )


## I.   BACKGROUND

This case is an employment discrimination action brought by plaintiff Debra Ouellette, a former employee of defendant Hannaford Bros. Co. ("Hannaford") in their Saco store. Plaintiff began working for Hannaford in Saco in June of 2007. (Def.'s S.M.F. ¶ 1.) A few years later in September 2012, she began working as a deli associate. (Def.'s S.M.F. ¶ 2.)

The essential functions of the deli associate position include: lifting up to 15 pounds frequently and up to 40 pounds occasionally; reaching to shoulder lifting 20 pounds frequently, and overhead occasionally; and performing repetitive grasping, hand and arm motions while standing and walking for the majority of the shift. (Def.'s S.M.F. ¶ 3.)

In September 2013, Ouellette was diagnosed with carpal tunnel in her right hand by Dr. John Dolan. (Def.'s S.M.F. ¶ 5.) Dr. Dolan completed a Certification of Health Care Provider for Employee's Serious Health Condition form (the "Certification") on October 2, 2013. (Def.'s S.M.F. ¶ 6.) The Certification provided that Ouellette had moderate to severe bilateral Carpal Tunnel Syndrome ("CTS") and noted that she would require surgery. (Def.'s S.M.F. ¶ 6.)

1

On February 5, 2014, Dr. Dolan requested that Hannaford give Ouellette several medical accommodations due to her CTS. (Pl's. S.M.F. ¶ 16.) Dr. Dolan requested that Hannaford only schedule Ouellette for early morning shifts because her hands tend to "lock up" in the afternoon hours. (Def.'s S.M.F. ¶ 6; Pl.'s S.M.F. ¶ 17.) This symptom was not a product of the time of day, but because of the amount of activity that Ouellette would engage in. (Def.'s S.M.F. ¶ 7.) Dr. Dolan further completed a Practitioners Report for the State of Maine Workers' Compensation Board (M-1), suggesting restrictions of lifting no more than 5 to 10 pounds, limitations on repetitive movements, and maximum 6.5 hour shifts, no more than 5 days per week. (Def.'s S.M.F. ¶ 10.)

Ouellette was occasionally scheduled to work in the afternoon despite Dr. Dolan's request that she only work mornings. (Pl.'s S.M.F. ¶¶ 35, 46-51, 56-57, 64.) Ouellette brought this to management's attention on multiple occasions, and at one point was given a verbal warning for leaving work early. (Pl.'s S.M.F. ¶¶ 46-51.)

After receiving Dr. Dolan's requests, Associate Relations Manager Lisa Williamson, Associate Relations Specialist Kenneth Kierstead, and Deli Manager Sarah Marcotte met with Ouellette to discuss the medical restrictions.[1] (Def.'s S.M.F. ¶¶ 11-12.) At this meeting, the group created a "transitional work plan" ("TWP") that was signed by Ouellette, Williamson, and Marcotte. (Def.'s S.M.F. ¶¶ 11-12.) Generally, TWPs are implemented when an employee has medical restrictions that temporarily prevent the employee from being able to perform all of the essential duties of their job and typically last six months, with periodic reviews, so employees can heal and transition back to their original role. (Def.'s S.M.F. ¶ 12; Pl.'s S.M.F. ¶ 11.) TWPs are not established or permanent positions in the store and they have no specific job description.

---

[1] As Associate Relations Manager, Williamson documents and responds to requests for accommodation and then contacts Kierstead, who then decides how to act on the requests. (PASMF ¶¶ 5-6.)

(Def.'s S.M.F. ¶¶ 28-29.) Although there is a six-month term, Hannaford has extended the term when associates can get healthier and medical restrictions can be removed in the process. (Def.'s Repl. S.M.F. ¶ 13; Williamson Dep. 14:21-16:30.)

Ouellette's TWP contained the following provisions:

> Work will be provided to Deb in shift intervals of 6.50 per day. Work will be provided to Deb on a daily basis per business needs of the total store. Deb is expected and required to show for all shifts that she is scheduled for, and if no work is available per the restrictions Deb will be sent home. Deb will be supervised by the manager on duty (MOD) and therefore will be scheduled no earlier than 7am. Deb is expected to check in with the MOD upon shift start and throughout the day for tasks to be completed. Deb is expected to not lift anything more than 5lbs, and will not conduct repetitive motion with her right hand. Deb will be scheduled 5 days a week unless she has requested a paid time off day and/or more than 2 days off. Due to the start time of Deb's shift of 7am we are unable to accommodate the early morning shift restriction. This may be re-evaluated upon further communication. If Deb is to work outside of the restrictions that are being provided this may result in performance counseling up to and including termination, and/or termination of the accommodations.

> Work duties that may be performed during this transition workplan: Dusting, returns/put backs, light cleaning total store (deli, bakery, center, etc), rotation, code date checking, facing/blocking, store sweeps, administrative duties of filing or photocopying, light stocking, answering phones, and any other duties that fall within her restrictions per business needs.

(Def.'s S.M.F. ¶¶ 13-14.) Ouellette additionally wrote next to her signature, "I am going to talk to Dr. Dolan about lifting 5 pounds, I would like to have this lifted." (Def.'s S.M.F. ¶¶ 13-14.)

Ouellette worked pursuant to the TWP until approximately mid-June. (Def.'s S.M.F. ¶ 18.) From this point until late August of 2014, she performed navigator tasks in the store. (Def.'s S.M.F. ¶ 18.) The "navigator" is not a specific job title, but a budgeted number of hours that the store manager, Steven Saucier, can use to help customers navigate the store during the summer. (Def.'s S.M.F. ¶ 19.) The Saco store does not assign navigator tasks after Labor Day. (Def.'s S.M.F. ¶ 21.) Ouellette resumed the tasks as outlined in her TWP in late August. (Def.'s S.M.F. ¶¶ 18.)

In October of 2014, Williamson received another note from Dr. Dolan. (Def.'s S.M.F. ¶ 23.) This note provided that Ouellette would be able to work 8 hours a day on light duty, but could not work in the deli. (Def.'s S.M.F. ¶ 23.) On October 13, 2014, Dr. Dolan clarified this note, stating that "light duty" included no repetitive activities of the hands and upper extremities, no

lifting of more than ten pounds, and no work in the deli department. (D.S.M.F. ¶ 25.) Dr. Dolan wrote a further note that read, "Debra can work only 6h/day, rotating blocking and returns and light cleaning. Limited to lifting 0-10 lbs." (Def.'s S.M.F. ¶ 26.)

At the end of the six-month period of Ouellette's TWP and without the ability to work in the deli, Williamson created a packet of job descriptions of all the positions in the store to review with Ouellette to see if there were any positions that she could perform, either with or without accommodations. (Def.'s S.M.F. ¶ 30.) After reviewing the packet, Ouellette stated that there were no positions that she could perform, even with accommodations. (Def.'s S.M.F. ¶ 33.) Consequently, Kierstead placed Ouellette on a 12-month leave of absence, during which she was invited to stay in touch in case circumstances changed and she was able to return to work. (Def.'s S.M.F. ¶ 34.)

During her leave, Ouellette remained unable to work with her hands. (Def.'s S.M.F. ¶¶ 35-44.) Dr. Dolan stated in his deposition that Ouellette could not work at all because of her hands, and concluded at a January 19, 2015 appointment that she had no work capacity. (Def.'s S.M.F. ¶¶ 36-37.) Ouellette filed a workers' compensation claim, and received an independent medical examination in October of 2015 from Dr. Carl Robinson. (Def.'s S.M.F. ¶¶ 38-39.) Dr. Robinson also concluded that Ouellette's CTS prevented her from using her hands in a repetitive manner, including moving cans and boxes from the back of a shelf to the front of the shelf, lifting more than five pounds, frequently writing or typing, pushing or pulling with her hands, and gripping tightly. (Def.'s S.M.F. ¶¶ 39-40.) As a result of her medical problems, Ouellette began receiving social security disability benefits in June 2015. (Def.'s S.M.F. ¶ 44.)

4

On January 11, 2016, plaintiff a Complaint alleging Retaliation in violation of the Maine Human Rights Act (Count I) and Disability Discrimination (Count II). On April 18, 2017, defendant filed the instant motion for summary judgment.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

## III.    DISCUSSION

### a.    Retaliation (Count I)

In Count I, Ouellette claims that Hannaford retaliated against her by taking her off the TWP due to her requests for accommodation and complaints about afternoon scheduling. Ouellette also argues that Hannaford retaliated against her by failing to place her in the navigator position in the summers of 2015 and 2016.

The Maine Human Rights Act ("MHRA") prohibits retaliation in circumstances where an "individual has opposed any act or practice that is unlawful under [the MHRA] or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the MHRA]." 5 M.R.S.A. § 4633(1). To establish a prima facie claim of retaliation, plaintiff must establish: (1) that she engaged in statutorily protected activity; (2) her

5

employer made an employment decision that adversely affected her; and (3) that "there was a causal link between the protected activity and the adverse employment action." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me. 1991). The Law Court has eliminated the use of the *McDonnel-Douglas* burden shifting framework in relation to Whistleblower Protection Act retaliation claims at the summary judgment stage. *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 39, 126 A.3d 1145. Because retaliation under the MHRA has the same elements as retaliation under the WPA, application of the *McDonnel-Douglas* framework is likewise inappropriate here. Consequently, the usual standard is applied:

> The employer has the burden to "show that there is no genuine issue as to any material fact," and that "the evidence fails to establish a prima facie case for each element of the cause of action[.]" As part of that process, the employee must produce evidence generating a triable issue on each of those elements. If the evidence in the summary judgment record would allow a jury to find for the employee on each element of the employee's case, then the employer is not entitled to summary judgment.

*Id.* (citations omitted). Further, the employee's burden on summary judgment of proving a prima facie case of retaliation is "relatively light," and simply demands "a small showing that is not onerous and is easily made." *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 14, 126 A.3d 1145 (citations omitted).

For summary judgment purposes, defendant only challenges plaintiff's ability to meet the causation required to prove the retaliation claims. In relation to plaintiff's first claim pertaining to her placement of leave, Ouellette claims she has proven her prima facie case by showing "animus by local management" by "repeatedly refusing to live up to the agreement to accommodate Ouellette to start her shift at 7:00 a.m." (Pl.'s Opp'n Def.'s Mot. Summ. J. 14.) Hannaford claims that it placed Ouellette on leave after the expiration of the six-month period of her TWP and the failure to find any available positions of which Ouellette could perform the essential functions.

6

In regards to her second retaliation claim, the reasons that plaintiff provides for causation are the "close temporal proximity" between Ouellette's conversations with management about her medical restrictions, her placement on medical leave and the "false" reason for deciding not to bring Ouellette back as a navigator in 2015 and 2016, as well as the history of "animus" displayed by Hannaford.

Taking the facts in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether a causal connection exists between Ouellette's protected activity and any adverse employment action. Consequently, summary judgment is not appropriate on plaintiff's retaliation claim.

### a. Disability Discrimination (COUNT II)

The MHRA provides, "A covered entity may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment." 5 M.R.S.A. § 4572(2). However, the MHRA "does not prohibit an employer from discharging . . . an individual with physical or mental disability, or subject an employer to any legal liability resulting from . . . the discharge of an individual with physical or mental disability, if the individual, because of the physical or mental disability, is unable to perform the duties . . . or is unable to be at, remain at or go to or from the place where the duties of employment are to be performed." 5 M.R.S.A. § 4573-A(1-B).

When addressing motions for summary judgment in MHRA discrimination cases, Maine courts apply the *McDonnell-Douglas* burden shifting framework articulated by the United States Supreme Court. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973); *Doyle v. Dep't of Human Servs.,* 2003 ME 61, ¶ 14, 824 A.2d 48. To develop a prima facie case of disability

7

discrimination under this framework, "the plaintiff has the burden of establishing the following: first, she suffers from a disability; second, she is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job; and third, she was adversely treated by the employer based in whole or in part on her disability." *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48 (citations omitted).

If the plaintiff establishes a prima facie case of discrimination, "the burden of production, but not of persuasion, 'shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* ¶ 15 (quoting *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 30 (1st Cir. 2002). If the defendant articulates a nondiscriminatory rationale, the employee can survive a motion for summary judgment by presenting sufficient evidence from which a fact-finder could determine "that either (1) the circumstances underlying the employer's articulated reason are untrue, or (2) even if true, those circumstances were not the actual cause of the employment decision." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 15, 45 A.3d 722 (quoting *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 16, 974 A.2d 276.). "There is no 'mechanical formula' for identifying pretext, and the issue of whether an employee has generated an issue of fact regarding an employer's motivation or intent is one heavily dependent on the individual facts before the court." *Cookson*, 2009 ME 57, ¶ 21, 974 A.2d 276 (citing *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 39-40 (1st Cir. 2003)).

### i. Qualified Individual with Disability

Defendant first challenges plaintiff's status as a "qualified individual with disability" under the MHRA. A "qualified individual with a disability" is defined for the purposes of employment discrimination as "an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that

8

the individual holds or desires." 5 M.R.S.A. § 4553(8-D). Defendant argues that Ouellette's medical restrictions prevented her from performing the essential functions of any employment position at Hannaford, with or without reasonable accommodation. Although plaintiff agrees that she was unable to work as a deli associate, she contends that she could have done work as a "navigator" or continued to work pursuant to her TWP.

The central issue to this dispute is whether either the TWP or the navigator role is a vacant position that Hannaford could have assigned to Ouellette. Generally, reassignment to a vacant position is a reasonable accommodation under the MHRA. 5 M.R.S.A. § 4553(9-A). The plaintiff bears the burden of proof to show that such a vacant position exists. *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001) (citations omitted).

It is undisputed that the TWP is not an established or vacant position at Hannaford. (D.S.M.F. ¶ 28.) Plaintiff argues that defendant could have chosen to extend the six-month term of the TWP, however it was not required to do so. Whether an employee is an otherwise qualified individual is determined by reference to a specific position. *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224-25 (11th Cir. 1997). If an employee claims that there is a vacant position to which she could transfer, "[i]nstead of addressing the essential functions of her current position, an employee must demonstrate that she can perform the essential functions of the position she desires." *Audette v. Town of Plymouth*, 858 F.3d 13, 20 (1st Cir. 2017). Additionally, employers are not required to create a job opening so a disabled employee can work. *Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 456 (1st Cir. 2016). The plaintiff must show "that there is an actual vacant position to which she can transfer." *Id.* (citing *Lang*, 813 F.3d at 456.) Further, plaintiff must show that she was qualified for the position and could have performed it given her medical condition. *Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016).

Particularly relevant to the instant case, "when an employer and employee have made arrangements to account for the employee's disability -- a court must evaluate the essential functions of the job without considering the effect of the special arrangements." *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 25-26 (1st Cir. 2001) (citations omitted). Evidence that such arrangements were made "merely shows the job could be restructured, not that [the function] was non-essential." *Id.* at 26 (*quoting Basith v. Cook Cty.*, 241 F.3d 919, 930 (7th Cir. 2001)).

Holding that accommodations supersede the essential functions of the original position "would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers." *Id.* (citations omitted); *see also Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) ("And if the employer . . . goes further than the law requires--by allowing the worker to work at home, it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation. That would hurt rather than help disabled workers."). Thus, the essential functions of a job remain essential despite arrangements allowing a disabled employee to avoid performing them. *Id.*

For example, in *Pickering v. City of Atlanta*, 75 F. Supp.2d 1374 (N.D. Ga. 1999), a prison allowed a guard to perform a "light duty" assignment for over two years, believing that the guard may recover from her disability. *Id.* at 1379. Eventually, the prison terminated the guard. *Id.* at 1377. The guard brought a disability discrimination suit, arguing that the prison was required to keep her in the "light duty" assignment as a reasonable accommodation. *Id.* However, the Court disagreed, holding, "In effect, defendant created a new job for plaintiff that prevented her from being exposed to physical trauma. In doing so, defendant eliminated the essential corrections officer functions from plaintiff's job. This was not a 'reasonable accommodation,' and the ADA

10

did not require defendant to take this action." *Id.* at 1379. Thus, the Court granted summary judgment in the defendant's favor. *Id.*

In the recent decision from the Federal District Court for the District of Maine, *Benson v. Wal-Mart Stores E., L.P.*, No. 2:16-CV-114-DBH, 2017 U.S. Dist. LEXIS 97130 (D. Me. June 23, 2017), the plaintiff employee made a strikingly similar argument to that made by Ouellette in this case. In *Benson*, an employee argued that despite not being able to perform the essential functions of her position, she could perform the essential functions of the positions of people greeter, fitting room attendant, or personnel associate. *Id.* at *7-8. However, the Court found that the employee had failed to demonstrate that those positions were actually vacant. *Id.* at *8. Instead, the evidence indicated that the employer created these temporary positions for workers injured on the job. *Id.* Thus, summary judgment on plaintiff's disability discrimination claim was appropriate. *Id.*

Plaintiff does not dispute that she is and was at the time the TWP was implemented unable to perform the essential duties of the deli associate position that she held. (Def.'s S.M.F. ¶ 33; Pl.'s Opp'n Def.'s Mot. Summ. J. 9.) Additionally, plaintiff and Williamson went over the vacant positions in the store and determined that she could not perform the essential functions of any of them. (Def.'s S.M.F. ¶ 33.) Plaintiff only points to the TWP and the navigator function as positions that she could have performed. However, the TWP is simply a light duty assignment accommodating plaintiff's disability, not an actual position.

Moreover, the navigator role is simply a subsidiary function assigned to existing associates occupying other positions, and not a position in and of itself. (Def.'s S.M.F. ¶¶ 19-20.) In contending that "navigator" was indeed a vacant position in the store, plaintiff relies solely on Williamson's deposition, where she stated that the Saco store had between 4-15 navigator openings for the summer of 2015 and Ouellette's deposition where she described the role. (Pl.'s S.M.F. ¶

11

73; Pl.'s Repl. S.M.F. ¶ 19.) However, Williamson also testified that this position is a temporary role for individuals who hold other jobs in the store. (Def.'s Repl. S.M.F. ¶ 73; Williamson Dep. 71:2-5.) Ouellette has not provided a job posting for the "navigator" position or an internal job description. Because the TWP and the role of navigator are not independent, vacant positions, plaintiff has not met her burden of proving the existence of a vacant position that she could perform, with or without reasonable accommodation.

## IV.  CONCLUSION

For the reasons set forth above, the defendant is entitled to summary judgment on plaintiff's disability discrimination claim, but not on plaintiff's retaliation claim.

The clerk shall make the following entry on the docket:

Defendant's motion for summary judgment is hereby DENIED as to Count I and GRANTED at to Count II.


SO ORDERED.

DATE: JANUARY 25, 2018

ENTERED ON THE DOCKET ON:___1/26/18

John O'Neil, Jr.
Justice, Superior Court

12