# United States Court of Appeals
## For the First Circuit

No. 13-1641

MARÍA J. COLLAZO-ROSADO,

Plaintiff, Appellant,

v.

UNIVERSITY OF PUERTO RICO; MARISOL GÓMEZ-MOUAKAD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

[Hon. Camille L. Vélez-Rivé, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Jorge Martínez-Luciano, with whom Emil Rodríguez-Escudero and
Martínez-Luciano & Rodríguez-Escudero were on brief, for appellant.
Edna E. Pérez-Román for appellee University of Puerto Rico.
Mayra M. González-Reyes, with whom Jiménez, Graffam & Lausell
was on brief, for appellee Marisol Gómez-Mouakad.

September 2, 2014

**THOMPSON, <u>Circuit Judge</u>.**

## Overview

We deal here with a suit by María J. Collazo-Rosado ("Collazo") against the University of Puerto Rico ("UPR") and Marisol Gómez-Mouakad ("Gómez") — Collazo's former employer and supervisor, respectively. A Crohn's-disease sufferer (Crohn's is a chronic inflammatory disease of the intestine), Collazo contends that the defendants did not renew her employment contract in retaliation for her complaining about disability-discrimination — an action that, she says, infracted 42 U.S.C. § 12203(a), which is the anti-retaliation provision of the Americans with Disabilities Act ("ADA"). She also contends that Gómez's conduct constituted First-Amendment retaliation under 42 U.S.C. § 1983. But on summary judgment, the district court rejected these claims as a matter of law. And in the pages that follow, we explain why the court got it right.

## Background

The relevant facts — read in the light most flattering to Collazo (the summary-judgment loser), consistent with record support, <u>see</u> <u>Soto-Padró</u> v. <u>Pub. Bldgs. Auth.</u>, 675 F.3d 1, 2 (1st Cir. 2012) — tell the following story. Collazo has lived with Crohn's disease for many years, at least since 2005. Sometime in 2006 she interviewed for a position as "mentorship coordinator" of the "academic support development center" at the UPR's Humacao

campus.  The center (which is what we'll call it from now on) is a federally-funded program at the UPR that (as its name suggests) offers students academic-support services, specifically in the area of natural sciences.  Collazo told her interviewer — Dr. Helena Méndez-Medina ("Méndez"), the center's then-codirector — that if she got the job, she would have to have access to a bathroom and be able to use accumulated sick leave to see her doctor or go for tests.  These were "reasonable accommodations," she told Méndez.  No problem, Méndez replied — or words to that effect.  Ultimately, the UPR hired Collazo in early winter 2006 on a contract set to expire in September 2007.  But twice the UPR renewed her contract on a one-year basis — in September 2007 and again in September 2008.

Collazo's job involved hiring and training students to mentor and tutor other students at the center; supervising the center's secretary, plus those students who worked and received services there; preparing surveys and reports; and managing the center's long-term "functionality."  Those tasks were hers and hers alone.  The center was open 7:00 a.m. to 5:00 p.m.  And her shift ran from 7:30 a.m. to 4:00 p.m.

About two months after starting at the center, Méndez sent a memo to all personnel — including Collazo — telling them to notify the administrative assistant first before missing work, arriving late, or leaving early.  She also reminded everyone that

they had to punch a time clock — which was near Collazo's desk — to signal their arrival at and departure from work. "No attendance card will be signed," Méndez added, "if it contains entries made by hand or changes in the work schedule that ha[ve] not been properly pre-authorized." Collazo, all agree, hand wrote her time on cards dozens of times before and after this memo, offering excuses like she "forgot to punch" in or the time-clock area was "closed."

Gómez became Collazo's immediate supervisor in August 2008. Chatting together one day around this time, Collazo mentioned she had Crohn's disease. And she explained the reasonable accommodations she had received and hoped to continue receiving: the ability to take frequent bathroom breaks and attend medical appointments. "[D]on't worry," Gómez told her, though she did ask Collazo to give center personnel a heads-up — by telephone, email, or text — whenever she was arriving late, leaving early, or away from her desk for any "considerable" span of time. The reason for this was that Collazo's job required that she be physically present at the center to supervise student mentors and tutors.

Collazo, it turns out, "normally" gave prior notice when she had a medical appointment. "Normally" is her word, not ours. And Gómez granted every one of her leave and absence requests — whether medically related or not — and never expressly or even impliedly stated that she could not take bathroom breaks.

-4-

Eventually, however, Gómez became concerned that the center was not meeting the program's goals and objectives. Here is what happened: In January 2009 the codirector of a center at the UPR's Arecibo campus — Dr. Philippe Scott — told Gómez that he too thought her center was underperforming, based on a head-to-head comparison of the two centers. On top of that, other professors complained about how the tutoring system was running. Professor Rolando Tremont, for example, director of the chemistry department at the UPR's Humacao campus, told Gómez he thought the center was not offering enough mentor and tutoring sessions to students in his department. He also complained that mentors and tutors were not regularly attending classes in his department. They needed to attend classes regularly, he said, because that way they would know what was being taught, which would make them better chemistry mentors and tutors at the center.

Worried that the federal government might defund the program, Gómez took a more active role in the center's operations, zeroing in on the staff's performance. She held meetings to discuss ways to improve. And she asked Collazo to put on more and different workshops. She also issued a memo in March 2009 that basically mirrored the one Méndez had issued two years earlier: Gómez reminded everyone — including Collazo — that persons needing to modify their work schedule must give advance notice. "[T]ime cards," Gómez added, "must be punched at the corresponding times,

not earlier or later without justification.  No attendance card will be signed if it contains entries made by hand or changes in the work schedule that ha[ve] not been properly pre-authorized."  Collazo signed the bottom of that memo.

Keeping an eye on her underlings' attendance, Gómez saw that Collazo was either coming in late, leaving early, or leaving her work area for long stretches — without giving anyone any advance notice.  So Gómez wrote her up, noting that her actions left the students without supervision; that they had talked about this problem many times before; that her "behavior [was] not permissible"; that she must follow proper protocol; and that she had at her disposal a number of ways to give the required notice.  Collazo later tried to defend herself, saying:  "If I was absent, well, I would call in."  But "they would hardly answer the telephone," she added — probably, she speculated, because "they" checked the "caller ID" before deciding whether to pick up.  She also later claimed that she had justified "all of these leaves" with "medical documents."  But the record evidence she cites to is a doctor's note dealing with just <u>one</u> absence.  For what it is worth, the UPR never lowered her salary because of her absences nor discounted the times that she was not at her work area.

Regrettably, on at least one occasion the visiting boyfriend of the secretary at the center laughed and made comments every time Collazo left the office, saying things like:  "Again.

Look, Juliana, again." We infer that he was referring to Collazo's trips to the bathroom. Collazo felt humiliated by the event. And she complained to Gómez, apparently, who did nothing about it. The record shows, though, that Gómez never made fun of Collazo's medical condition and never allowed any employee to make fun of her condition either.

Fed up with what she thought was discriminatory treatment, Collazo complained to her union, formally asked the UPR for reasonable accommodations (ready access to a bathroom and flexibility to attend medical appointments), and filed charges of disability-based discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). To back up her position, she got a medical certificate from the director of the UPR's Center for Inflammatory Bowel Disease. The certificate read in part:

> [Collazo's] condition is protected by the [ADA]. [She] requires reasonable accommodation in her work. She needs ready access to the bathroom, and flexibility in her time schedule to allow for visits to the physician, laboratory or other diagnostic or treatment facility. She may unexpectedly become ill and require use of her sick leave without prior warning.

Concluding that Collazo's reasonable-accommodation request simply sought "improv[ed] labor relations in the workplace," the UPR's reasonable-accommodation committee recommended in June 2009 that the "parties" try to resolve their

differences "voluntarily" through something called the "Employee Assistance Program." As for the EEOC matter, the record does not tell us what happened there. But neither the UPR nor Gómez argues that Collazo failed to exhaust her administrative remedies. And because that issue does not go to our jurisdiction, see O'Rourke v. City of Providence, 235 F.3d 713, 725 n.3 (1st Cir. 2001), we say no more about that subject.

Moving on, we see that Gómez completed a written evaluation of Collazo's performance in June 2009, giving her an overall "B" rating. "B" stands for "Below Expectations. Failed to meet expectations or met them only partially." Gómez explained her thinking in writing, emphasizing that Collazo had done a poor job training and supervising tutors and mentors; had run workshops that did not meet the science and math departments' needs; had failed to conduct a required "satisfaction survey" with participating students; and had failed to follow the attendance policy. "I don't agree with the evaluation," Collazo wrote in response. "It is subjective and does not respond to the reality of the process."

Collazo's employment contract was due to expire in September 2009. And Gómez recommended that the UPR not renew it, noting that Collazo's performance was not up to snuff and that the program needed some restructuring. So in August 2009, Gómez wrote Collazo and said the UPR had decided not to re-up her, citing the restructuring rationale. The letter pertinently provides:

-8-

During the past months we have discussed with the [program's] Director the functions, costs and projections of [the center's] Tutors and Mentors Coordinator position, which you occupy at present.

In response to these changes, we have decided not to extend you a new contract for the next year . . . .

Later, Gómez appointed two persons to fill Collazo's old job. And the center's performance dramatically improved with them at the helm: the center offered more mentor and tutoring sessions, and the participating students got better grades as a result.

Believing that she was the victim of retaliation for complaining about disability discrimination, Collazo filed this federal-court lawsuit, naming the UPR and Gómez as defendants. Besides a retaliation claim against the two under the ADA, Collazo also asserted a First Amendment free-speech retaliation claim against Gómez under § 1983.[1] On the recommendation of a magistrate judge, however, the district court granted summary judgment to the UPR and Gómez. "Accept[ing]" that Collazo had made out a prima facie ADA-retaliation claim, the court made two key findings: first, that the UPR and Gómez had put forth legitimate, nonretaliatory reasons for not renewing her contract — her not fulfilling "the [c]enter's goals, which required a restructuring at

---

[1] She alleged equal-protection and Puerto-Rico-tort claims too. But she voluntarily dismissed her equal-protection claim with prejudice. And after disposing of her federal claims on summary judgment, the court declined to exercise supplemental jurisdiction over her commonwealth claim. Neither of these claims is before us.

the [c]enter," and her not "comply[ing] with" the center's "attendance policy," to quote the court — and second, that she had not shown that these reasons were really just pretext masking retaliatory intentions.  The court then ruled that Collazo's First-Amendment-retaliation claim failed because, as the court saw it, "the ADA constitutes an exclusive remedy" here.  Which brings us to Collazo's appeal.

**Standard of Review**

We give fresh review to the district court's summary-judgment decision, construing all reasonable inferences in Collazo's favor and affirming only if no genuine issue of material fact remains <u>and</u> the UPR and Gómez are entitled to judgment as a matter of law.  <u>See</u>, <u>e.g.</u>, <u>Nieves-Romero</u> v. <u>United States</u>, 715 F.3d 375, 378 (1st Cir. 2013); <u>Soto-Padró</u>, 675 F.3d at 5.  Of course, conclusory assertions, improbable inferences, and sheer speculation cannot save Collazo from summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Nieves-Romero</u>, 715 F.3d at 378; <u>Soto-Padró</u>, 675 F.3d at 5.  And we can sustain the grant of summary judgment on any basis the record supports, including one not relied on by the court.  <u>See</u>, <u>e.g.</u>, <u>Soto-Padró</u>, 675 F.3d at 5.

We now take on the issues in play, adding additional details as needed.

-10-

## ADA Retaliation

Up first is whether the district court erred in rejecting Collazo's ADA-retaliation claim on summary judgment. We start with the basics. The ADA, broadly speaking, makes it illegal for employers either to discriminate because of a person's disability, see 42 U.S.C. § 12112(b)(1), or to retaliate against someone because she opposes an act made unlawful by the ADA, see 42 U.S.C. § 12203(a). The fight here focuses on retaliation. And because Collazo tries to show retaliation through circumstantial evidence, we apply the familiar burden-shifting analysis. Under that framework, Collazo must first show that she engaged in statutorily-protected activity; that the UPR and Gómez took an adverse employment action against her; and that a causal connection existed between their action and her activity. See, e.g., Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013). If she makes this prima facie showing, the burden shifts to the defendants to offer a legitimate, nonretaliatory reason for their actions, and then back to her to show that the reason was mere pretext. See id. To establish pretext she must show that the explanation was a lie, which would let a factfinder infer that the defendants made the story up to cover their tracks. See Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria—P.R., 404 F.3d 42, 45 (1st Cir. 2005). It is not enough for her to show that they were wrong or tactless. See id.; see also Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir.

2002). After all, the law does not empower courts to act as "super-personnel department[s]," looking to undo bad employment decisions. Gonzalez, 304 F.3d at 69 (parenthetically quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)).

"The simplest way to decide a case is often the best," we have noted. Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013) (quoting Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998) (R. Arnold, J.)). And there is a simple way here.

Like the district court, we assume without deciding that Collazo established a prima facie inference of retaliation. Also like the lower court, we accept for argument's sake that the UPR and Gómez effectively rebutted her prima facie showing by responding that it did not renew her contract both because she failed to meet the goals set for the center, necessitating the center's restructuring, and because she failed to follow the center's attendance policy. That leaves us only with the pretext question.[2]

One way to establish pretext is to show that the UPR and Gómez gave "different and arguably inconsistent explanations" for their actions. See Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000). "[W]eaknesses, implausibilities,

_____

[2] The parties jump straight to pretext too.

-12-

inconsistencies, incoherencies, or contradictions" in their proffer can do the trick, see <u>Harrington</u> v. <u>Aggregate Indus.-Ne. Region, Inc.</u>, 668 F.3d 25, 33 (1st Cir. 2012) (internal quotation marks omitted)[3] — unless the record conclusively reveals that the real motive was an unstated reason that is nonretaliatory, see <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000). With that said, Collazo's pretext argument proceeds in five steps. <u>One</u>: The nonrenewal notice from the UPR and Gómez mentioned the center's restructuring as the reason for their decision. <u>Two</u>: Yet they suggest in this court (as they did in the district court) that they had two valid reasons for the nonrenewal, <u>i.e.</u>, (a) her not fulfilling the center's objectives, requiring the center's restructuring, and (b) her not following the center's attendance program — even though they never admonished her for her performance or disciplined her for her absences. <u>Three</u>: But — to quote her brief — they floated "[n]one of these alleged reasons" in the nonrenewal letter, concocting them "after the fact." <u>Four</u>: And these sham justifications became a convenient pretextual basis for getting rid of her. <u>Five</u>: So summary judgment on the ADA-retaliation claim cannot stand.

Although cleverly crafted, we cannot accept Collazo's argument. For starters, she cites no contract provision,

---

[3] <u>Accord</u> <u>Hodgens</u> v. <u>General Dynamics Corp.</u>, 144 F.3d 151, 168 (1st Cir. 1998).

-13-

regulation, statute, or caselaw suggesting that the UPR and Gómez had to give her _every_ reason they had for not renewing her contract. Consequently any argument in this direction is waived for lack of development. See, e.g., Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140-41 (1st Cir. 2013) (deeming waived an argument "not fully developed, lacking any citation to supporting authority (or even a persuasive explanation of what the law should be, assuming they found no authority)").

Also, a key premise of her theory — that performance and attendance issues are simply post-hoc inventions, conjured out of thin air after the fact to hide retaliatory animus — enjoys no record support. Actually, and devastating to her thesis, the summary-judgment evidence cuts the other way.

As for performance, remember how Dr. Scott and Professor Tremont gave Gómez an earful on the center's slipshod mentor and tutor program. And do not forget, Collazo was the center's frontline person, tasked with hiring, training, and supervising mentors and tutors, among other things. Gómez convened staff meetings as well — which Collazo attended — to discuss performance fixes, with one idea being offering other kinds of workshops. Recall too how in evaluating her work, Gómez stamped Collazo's net performance "below expectations." And to mention just a few of Collazo's shortcomings, we remind the reader that Gómez criticized her workshop offerings, her supervision of mentors and tutors, and

-14-

her failure to follow the center's written attendance policy; admonishments every one — and chronicled along the way too — despite what Collazo now suggests.

As for attendance, remember the paper trail of Gómez-penned memos documenting Collazo's many unannounced leaves, late arrivals, and early takeoffs, for example, not to mention her frequent failure to punch in and out on the time clock as required. Gómez's evaluation likewise highlighted Collazo's attendance problems, as we noted a second ago. Collazo says that she "normally" gave prior notice whenever she had a scheduled medical appointment. How this helps her with her other absences — which left the center unattended for large chunks of time — she does not say. Regardless, "'[n]ormally' does not mean 'always,'" obviously. Rodríquez v. Municipality of San Juan, 659 F.3d 168, 178 (1st Cir. 2011). Also, she admits to not always punching the time clock like she was supposed to, often because she just plain "forgot" to do so. But wait, she protests, there is no record evidence that the defendants took disciplinary action against her because of any absenteeism or tardiness. And — her argument continues, at least inferentially — they first had to have initiated disciplinary proceedings to have a shot at fending off her pretext challenge. The difficulty for Collazo, though, is that she cites no authority for that proposition. Nor does she explain why she is right despite the lack of authority. Thus any argument along these lines

is waived due to inadequate briefing.  <u>See</u>, <u>e.g.</u>, <u>Medina-Rivera</u>, 713 F.3d at 140-41.  In any event, the fact that the defendants chose not to take more serious disciplinary action does not itself permit a reasonable inference that the extensive contemporaneous evidence of her attendance problems is inaccurate or insincere.

The bottom line is that the summary-judgment record undoes Collazo's claim that the performance and attendance rationales were a sham dreamed up by the defendants after her nonrenewal to hide their retaliatory intentions.  That pokes a very large hole in her pretext theory.  So too does the fact that the defendants mentioned the restructuring rationale — which also has record support — in their nonrenewal letter and then in their court papers.  That is a consistency, clearly, not an inconsistency.  And here is the clincher:  The general rationale noted in the nonrenewal notice (restructuring) and the more specific ones noted in later documents (poor performance, requiring the center's restructuring, plus attendance problems) are not inconsistent; the need for a restructuring jibes with the defendants' documented unhappiness with Collazo's less-than-successful tenure at the center, what with her performance and attendance issues.  At the very least the rationales are not so inconsistent as to be "unworthy of credence," which is the test.[4]  <u>See</u>, <u>e.g.</u>, <u>Hodgens</u>,

_____

[4] As a parting shot, Collazo accuses the defendants of "manufactur[ing]" a document — called a "certification" — years after they "show[ed]" her "the door."  Prepared by the UPR's human

-16-

144 F.3d at 168 (internal quotation marks omitted).  It follows —
like night the day — that Collazo failed to meet her burden of
creating a triable issue of fact on the pretext question.  And so
the court rightly granted the defendants summary judgment on this
part of the case.

## First-Amendment Retaliation
## Under § 1983

Collazo next challenges the lower court's grant of
summary judgment on her First-Amendment-retaliation claim brought
against Gómez under § 1983.  Generally speaking, a claim like that
requires a plaintiff to show that she spoke on a matter of public
concern and that her speech was a "motivating factor" — i.e., that
it "played a substantial part" — in triggering the supposedly
retaliatory action.  See, e.g., Mt. Healthy City Sch. Dist. Bd. of
Educ. v. Doyle, 429 U.S. 274, 286-87 (1977) ("Mt. Healthy," for
short); Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013).  If
she can do that, the burden then shifts to the defendant to show

---

resource department at the UPR's lawyer's request, the document
discusses the restructuring that took place at the center post-
Collazo.  She gives no indication that she ever asked the district
court to strike the certification, even though she insists that
that document is not "'admissible evidence'" because "it is not
supported by any contemporaneous records."  But the certification
is buttressed with a number of supporting documents written hard on
the heels of her nonrenewal (the defendants made this point in
their brief, yet Collazo's reply brief does not mention it).  So
her argument here does her no good.  In any event, we have relied
only on some of the supporting papers and not on what was written
in the certification.

that she would have taken the same action without the speech.  <u>See</u>,
<u>e.g.</u>, <u>Mt. Healthy</u>, 429 U.S. at 287.

Moving from the general to the specific, we remind all
that in jettisoning this claim, the district court deemed relief
unavailable under § 1983 because it thought the ADA was the
exclusive remedy for Collazo.  The parties, naturally, debate the
correctness of the court's ruling, particularly in light of
<u>Fitzgerald</u> v. <u>Barnstable School Committee</u>, 555 U.S. 246 (2009).
That case holds that Title IX of the Education Amendments of 1972
"was not meant to be an exclusive mechanism for addressing gender
discrimination in schools, or a substitute for § 1983 suits as a
means of enforcing constitutional rights."  <u>Id.</u> at 258.

We have not yet decided how <u>Fitzgerald</u> applies in a case
like Collazo's.  And today is not the day to do so.  That is
because even if we assume favorably to her that the ADA does not
foreclose § 1983 relief in a post-<u>Fitzgerald</u> world (and we intimate
no opinion on that score), she runs up against another problem:
She would still have to show that her speech was both protected and
a substantial or motivating factor in the defendants' adverse-
employment decision.  And this she cannot do because — regardless
of whether she engaged in protected speech (a matter on which we
need not opine) — having failed to show that the defendants'
explanations for her nonrenewal really constituted pretext for ADA
retaliation, she also "fail[s] to generate a genuine issue of

material fact on the 'substantial or motivating factor' element" for First-Amendment retaliation.[5] See D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). Ultimately, then, the district court properly granted summary judgment to Gómez on this claim, even though we took a different tack in reaching that conclusion.

## Final Words

Our work over, we affirm the judgment below in all respects and award the defendants their costs on appeal.

---

[5] Collazo's counsel candidly conceded at oral argument that if her ADA-retaliation claim failed so too would her First-Amendment-retaliation claim.