# United States Court of Appeals
## For the First Circuit

No. 16-1130

BELSITO COMMUNICATIONS, INC., d/b/a 1st Responder Newspaper;
BRIAN K. BLACKDEN,

Plaintiffs, Appellants,

v.

JAMES DECKER, New Hampshire State Trooper; COLONEL ROBERT L.
QUINN, Director of the Division of State Police, New Hampshire
Department of Safety,

Defendants, Appellees.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

———————————————

Before
Thompson and Barron, Circuit Judges,
and McConnell, District Judge.*

———————————————

Robert N. Isseks for appellant.
Matthew T. Broadhead, Assistant Attorney General, with whom
Joseph A. Foster, New Hampshire Attorney General, was on brief,
for appellees.

———————————————

December 23, 2016

———————————————

———————————————

* Of the District of Rhode Island, sitting by designation.

**THOMPSON**, <u>**Circuit Judge**</u>.

## LEAD-IN

Brian Blackden is a part-time freelance photographer who for years has sent photos to a bunch of regional-media outlets, including Belsito Communications, Inc. (just "Belsito" from now on). Belsito and Blackden filed this suit alleging that New Hampshire State Trooper James Decker violated their constitutional rights when he seized Blackden's camera at the scene of a vehicle crash in August 2010. Belsito and Blackden lost on summary judgment. And they fare no better on appeal: having studied the record and considered the parties' arguments in light of applicable law, we conclude, first, that Belsito lacks standing to pursue its constitutional claim; and, second, that even if Trooper Decker did violate Blackden's constitutional rights (a point we need not decide), Blackden failed to identify clearly-established law in August 2010 placing the illegality of the Trooper's conduct beyond debate.

## HOW THE CASE GOT HERE[1]

Back in the early 1980s, Blackden briefly worked as a firefighter-EMT for the New Hampshire towns of Kingston and Newton

---

[1] We summarize the facts in the light most agreeable to Blackden and Belsito, the summary-judgment losers. <u>See, e.g.</u>, <u>Rivera-Corraliza</u> v. <u>Morales</u>, 794 F.3d 208, 210 (1st Cir. 2015). Trooper Decker's brief points out that the parties (and the judge) relied on his statement of undisputed facts sketched in his

— though he has never been licensed or certified as a firefighter by the state.[2] Jump forward a few years. In the early to mid-1990s, Blackden worked as an in-house photographer for the town of Milton's fire department, a job that involved taking videos and pictures of fires and accidents for the department. And since the mid-2000s, he has worked as a freelance photographer, in addition to owning a company that sells camping-survival equipment (he gets most of his income from selling that gear).

As a freelance photog, Blackden submits photos to a number of regional news outlets, including Belsito, a publisher of a website and newspaper called "1st Responder News" — a "niche publication . . . delivered to the emergency services community . . . that reports on local news and incidents within the states that it serves."[3] Turns out, anyone can send in photos or stories to the website. All a person has to do is first create a username and password to access the website and then submit the material using an online form. Editors typically review stories submitted

---

summary-judgment memo — plaintiffs' memo opposing summary judgment "did not contest the facts described" in his summary-judgment papers, he adds. And plaintiffs' reply brief does not contradict that point. So we "deem[]" Trooper Decker's fact statement "admitted." See D. N.H. R. 56.1.

[2] All towns mentioned in this opinion are in New Hampshire.

[3] Blackden has also sent photos to various television stations and newspapers, like New England Cable News and the Concord Monitor.

by newer "correspondents" — with "correspondent" defined as anyone who submits content to the website. But correspondents who have submitted content "for a while" can skip the review process. Most of the material Belsito publishes in its print newspaper comes from items it chooses to take from the website postings. And Belsito only pays correspondents if it publishes their content in its newspaper.

Blackden began sending photos to Belsito in 2009. He has submitted over 400. He does not remember how many made it into Belsito's newspaper. But he does recall that one photo made the paper's front page. Belsito has never paid him a dime for any photos. Blackden says that "instead of money" the company will give him "a trade-off for advertising." But Belsito denies having that kind of relationship with him.

In 2009 or 2010, Blackden bought an ambulance once used by the town of Derry. He modified the vehicle only slightly, swapping out the red lenses from the vehicle's front for yellow lenses (he did not touch the rear red lenses) and adding a sign above the rear license plate that read "Fire Department Photographer." Blackden kept a portable radio in the ambulance tuned to all the fire department radio bands for essentially the whole southern half of the Granite State. And he usually kept lots of different gear in the ambulance, like a black firefighter

- 4 -

helmet with the word "photographer" on it, a black turnout coat, and a blue vest with the word "photographer" on the back. The vest also had an ID badge with Blackden's photo and the words "1st Responder News, Brian K. Blackden, New Hampshire Region Contributing Correspondent" on it.

Early on the morning of August 25, 2010, Blackden was awakened by an alert on his radio indicating that an auto accident had occurred on Interstate 93. The car had hit a tree in the median on the left side of the highway. And the Penacook rescue squad and the Canterbury fire department hurried to the scene. Dragging himself out of bed, Blackden hopped into his repurposed ambulance and drove to the scene. When he got there, he parked on the right side of the highway, at the edge of the pavement. He put on his "gear," walked across the interstate, stood in front of a Penacook fire department's rescue vehicle, and started taking pictures of the scene. His "gear" included a firefighter's helmet with the word "photographer" on it and a firefighter's turnout coat. Blackden knew that protocol required that he get the commanding firefighter's permission before accessing the accident scene — he could tell where the scene was based on how the emergency vehicles parked. Anyway, he did not ask for permission here.

It is fair to say that Blackden's getup confused some of the emergency responders at the crash site. For example, the scene

commander, Canterbury Fire Chief Peter Angwin, assumed that Blackden was with the Penacook rescue team. At some point, Chief Angwin asked Blackden if that was his vehicle parked on the right side of the highway. Blackden said "yes." Convinced that the vehicle's location posed a potential safety hazard, Chief Angwin asked him to move it to the same side of the interstate as the rescue vehicles. Blackden did just that, driving his repurposed ambulance to the left side of the highway and pulling up behind a fire truck. As he got out of the ambulance, Blackden activated the red "wig-wag" lights on the top rear of his vehicle, the yellow "arrow" lights, and the emergency (brake light) flashers.

Hearing that the driver of the vehicle involved in the accident had died, Blackden told Chief Angwin that "Penacook Rescue is leaving[;] I take photographs at a lot of their scenes" and asked if he would "like extraction photos," to which the Chief replied "no." Chief Angwin later said that Blackden had "stated that he was with Penacook or something about Penacook Rescue," adding that had Blackden been "dressed in a shirt and a tie, I would have had him removed from the scene" and stressing that "Blackden was able to get that close to the vehicle because of the gear that he had on and because of what he had previously said" about being "with Penacook." Anyhow, after Chief Angwin said "no"

to his photo-extraction offer, Blackden started walking back to his ambulance. And that is when he ran into Trooper Decker.

When Trooper Decker got to the crash site, he saw an "ambulance-like" vehicle parked at the rear of the scene, with its red lights activated in a "wig-wag" fashion. Spotting Blackden in the "active scene" wearing a firefighter's getup, the Trooper questioned him. According to Trooper Decker, Blackden identified himself as being "with Penacook Rescue" and said he was there to photograph the scene on behalf of Penacook Rescue. After determining that Blackden was not a rescue-team member of any of the responding fire departments, Trooper Decker asked him for his firefighter credentials. "You claimed you're here with Penacook Rescue," Trooper Decker recalled saying to Blackden, so "[y]ou must have something that says you're with Penacook Rescue" — "[n]obody over there knows you." To this Trooper Decker recalled Blackden saying that he had "left them at home."

Based on what had gone down, Trooper Decker believed Blackden had committed a slew of state-law crimes, including unlawfully impersonating an emergency rescue provider, unlawfully entering an emergency scene, and unlawfully using emergency lights. Trooper Decker also believed Blackden knew he was under investigation for possible state-law violations. And because he believed the camera contained evidence of criminal activity —

evidence that easily could be destroyed quickly — Trooper Decker thought exigent circumstances justified taking the camera without a warrant.[4] Still, he took the precaution of running this by a local prosecutor.

Whenever there is a fatal auto accident, the responding trooper must contact the county attorney's office and say whether "there is a criminal aspect to the crash." So Trooper Decker grabbed his cellphone, called the county attorney's office, and spoke with Assistant County Attorney ("ACA") Susan Venus. Trooper Decker told her about the auto-crash fatality, saying he thought the driver had probably fallen asleep at the wheel. But then he told her about

> a subject on scene who was dressed in emergency turnout gear who had driven a surplus ambulance with active emergency lights to this scene and parked that vehicle on a restricted access highway in and amongst the other emergency vehicles and had gotten out and was in the scene taking photographs.

"[N]obody" there "knew who this person was," the Trooper added, and "he was not a member of any . . . of the responding agencies." The Trooper also told ACA Venus that he was considering seizing Blackden's digital camera as evidence of criminal conduct. And after filling her in on the particulars of the situation, Trooper

---

[4] "Exigent circumstances" is a fancy way of saying "there is an emergency or other urgent need." United States v. Allman, 336 F.3d 555, 557 (7th Cir. 2003) (Posner, J., for the court).

Decker asked ACA Venus what she thought of his camera-seizure idea. She gave him the go-ahead.

So Trooper Decker took the camera. But he did not take anything else, like the turnout coat, helmet, or ambulance. Asked why he had not seized these other things, the Trooper explained at his deposition that he "was most concerned" with the camera because it contained easily destroyable evidence of potential criminal actions. The photos, he added, placed Blackden

> in the scene. Impersonation is going to be contextual. It's a contextual offense. If Mr. Blackden chooses to dress as a firefighter for Halloween and goes to a costume party, nobody's going to charge him with impersonation.

But, the Trooper noted, if Blackden "dresses as a firefighter and drives a surplus ambulance to a fatal crash scene, gets out, takes photos which can only be taken from certain points of view" — *i.e.*, within the confines of the accident scene — "and then says" several times that "he's with Penacook Rescue, contextually that's impersonation." Sounding a consistent theme, the Trooper stressed that the camera mattered the most because he believed its metadata — which Blackden could erase with just a push of a button — could help "recreate Blackden's exact location within the scene relative to the location of the crash" and so provide evidence of Blackden's unauthorized accident-scene presence.

Trooper Decker did not arrest Blackden on the spot, though the parties concede that he had probable cause to do so. After letting him go, the Trooper confirmed with the lead emergency responders that Blackden was not a member of their squads and had not gotten permission to be there. Running a records check, the Trooper also learned that Blackden had never been a licensed firefighter and that his EMT license had expired in the late 1980s.

The next day, August 26, Trooper Decker sought and received a warrant authorizing him to search the digital images on Blackden's camera. Blackden got his camera back the following day. But consistent with state law, the police kept the memory card as evidence of Blackden's alleged unlawful conduct. See generally N.H. Rev. Stat. Ann. § 595-A:6. Blackden later got charged under state law with: unlawfully displaying red emergency lights on his repurposed ambulance; unlawfully entering a controlled emergency scene; purposely impersonating emergency medical personnel; and obstructing government administration. Skipping over details not relevant to the issues on appeal, we see that after his criminal case wended its way through state court, Blackden stands convicted of the red-light violation.[5]

---

[5] Belsito and Blackden's lawyer told the district judge in this case that his client's red-light-violation conviction is "a valid conviction and it's the only conviction of his" — at least

Invoking 42 U.S.C. § 1983 — a statute that (broadly speaking) imposes liability on a person acting under state law who infringes the federally-guaranteed rights of another — Belsito and Blackden eventually filed this civil suit against Trooper Decker in New Hampshire federal court.[6] Their operative complaint alleged that Trooper Decker's warrantless seizure of Blackden's digital camera and memory card violated Blackden's Fourth Amendment rights. They also alleged that Trooper Decker's actions kept Blackden from exercising his First Amendment right to publish the accident-scene photos. And they further alleged that the Trooper's actions violated Belsito's own constitutionally-protected right to publish Blackden's accident-scene pics as well.

After some discovery, Trooper Decker asked for summary judgment. Granting the motion, the judge's ruling ran essentially as follows (we only hit the highlights). Belsito, the judge said, had no standing to bring any constitutional claim because (among other things) Belsito did not show that Trooper Decker took "any of its property" and did not "show[] any cognizable interest in

_____

that is what the judge said in his decision, and Belsito and Blackden's briefs do not contradict that point.

[6] Belsito and Blackden also sued Robert Quinn, in his official capacity as the Director of the Division of State Police, New Hampshire Department of Public Safety. But the judge granted Quinn's motion to dismiss. And Belsito and Blackden do not challenge that ruling. So we say no more about Quinn.

- 11 -

the contents of Blackden's memory card (other than the entirely speculative claim that if it had been given a timely opportunity to review Blackden's photographs, it may — or may not — have exercised its discretion to publish them)." Convinced the Trooper had probable cause to believe Blackden had violated the law, the judge found "exigent circumstances" — specifically the threat of evidence destruction — justified the warrantless seizure of Blackden's camera. The judge also saw no First Amendment violation, given that Blackden had no constitutional "right to unlawfully enter a controlled emergency scene — even if he intended to engage in conduct otherwise typically protected by the First Amendment." Wrapping up, the judge stressed that Trooper Decker was qualifiedly immune from suit, even if his actions resulted in a constitutional violation under current law, because constitutional standards (as applied to a situation like this) were unclear at the time of the disputed conduct.

## STANDARD OF REVIEW

We review the judge's grant of summary judgment *de novo*, asking whether, taking the facts in the light most agreeable to Blackden and Belsito, there is no genuine dispute as to any material fact and Trooper Decker is entitled to judgment as a matter of law. See, e.g., Rivera-Corraliza, 794 F.3d at 214; Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 89, 92 (1st Cir.

- 12 -

2014); see also Santiago-Ramos v. Autoridad de Energía Eléctrica de P.R., AEE, a/k/a P.R. Power Co., 834 F.3d 103, 105-06 (1st Cir. 2016). And we can affirm summary judgment on any ground supported by the record. See, e.g., Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

## ISSUES INVOLVING BELSITO

As they did in the district court, the parties duke it out over whether Belsito has standing to litigate a First-Amendment claim against Trooper Decker.[7] Belsito comes out swinging, insisting that Trooper Decker's warrantless seizure of the camera "prevent[ed]" it from publishing "Blackden's photos" and so gave rise to an injury in fact fairly traceable to the Trooper's conduct and redressable by judicial relief. *Au contraire*, counters Trooper Decker: the summary-judgment record contains no evidentiary support for "the claim that Blacken was taking photos on behalf of Belsito" or that Belsito "had any contractual relationship" with "or legal interest in Blackden's personal property or photographs"

---

[7] We must address a party's standing to push constitutional claims even if the claims are easier to resolve than the standing issue. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 99, 101 (1998) (rejecting as "precedent-shattering" the idea that an "an 'easy' merits question may be decided on the assumption of jurisdiction," and noting that "[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment — which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning").

- 13 -

and so Belsito's "claim is far too attenuated to vest it with standing in this matter."  We score this round for Trooper Decker.

## Standing Rules

It goes without saying — but we say it anyway — that federal courts are courts of limited jurisdiction, limited to deciding certain cases and controversies, for example.  See U.S. Const. art. III, § 2.  A key component of the case-or-controversy requirement is that a suing party demonstrate standing to sue. And to show standing in this sense, "[t]he party invoking federal jurisdiction" — here, Belsito — must show the following:  (a) "an injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (b) "a causal connection" — what the high Court occasionally calls "traceability" — between the injury and the challenged conduct; and (c) redressability — that the injury will "likely . . . be redressed by a favorable decision."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (quotation marks omitted). Importantly, the suing party at the summary-judgment stage must point to specific evidence in the record, not simply rely on "mere allegations."  See id. at 561 (quotations omitted); accord Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005) (emphasizing that "[t]he party seeking to invoke the federal court's

jurisdiction — normally, the plaintiff — bears the burden of pleading and proof on each step of the standing pavane").

**Applying the Rules**

Belsito spends a lot of time talking about how news gathering enjoys some First-Amendment protection, which is an uncontroversial statement of the obvious. See Branzburg v. Hayes, 408 U.S. 665, 681 (1972) (noting that "without some protection for seeking out the news, freedom of the press could be eviscerated"). But as for its injury-in-fact claim, Belsito says (emphasis ours) that it is this, and this alone: "the 'injury in fact' is the loss of the opportunity to publish" the August 25 pics Blackden had snapped "on Belsito's behalf while [he] was acting as [its] correspondent." The insurmountable problem for Belsito is that it cites no evidence to back up its theory that Blackden took the photos on its behalf. And we will not become archeologists, devoting scarce judge-time to dig through the record in the hopes of finding something Belsito should have found. See Rodríguez-Machado v. Shinseki, 700 F.3d 48, 50 (1st Cir. 2012) (per curiam) (reminding lawyers and litigants — using a colorful quote from a Seventh-Circuit opinion — that "[j]udges are not like pigs, hunting for truffles" buried in the record (alteration in original) (quotation marks omitted)). What Belsito does do — helpfully and commendably — is concede that

- Belsito has no contractual relationship with Blackden;

- "the photos on" Blackden's camera's "memory card were not technically Belsito's";

- "Blackden could have taken the photos for anyone"; and

- Belsito "'may — or may not — have'" published the pics had Blackden offered them to it (here, Belsito is quoting the district judge).

True, as Belsito notes, Blackden has submitted hundreds of photos to Belsito's 1st Responder website since 2009. But Belsito's reply brief does not dispute Trooper Decker's point that "as a freelance photographer, Blackden may have sent the [August 25] photographs to any number of other media outlets without any obligation to Belsito."

The net result: by failing to provide record support for its injury-in-fact theory — namely, that Balckden took the pics on its behalf — Belsito has not carried its burden of establishing standing. See Osediacz, 414 F.3d at 143.

Enough said about standing.

### ISSUES INVOLVING BLACKDEN

On the qualified-immunity front, our combatants battle over whether Trooper Decker violated clearly-established Fourth- and First-Amendment law. This round goes to the Trooper too, however.

- 16 -

## Qualified-Immunity Rules

Qualified immunity protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess — in other words, it shields from liability "all but the plainly incompetent or those who knowingly violate the law." See Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)); see also Rivera-Corraliza, 794 F.3d at 215. "[R]easonable mistakes," the Supreme Court tells us, "can be made as to the legal constraints" on officers, and when that happens, the officer is qualifiedly immune from damages. Saucier v. Katz, 533 U.S. 194, 205 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); see also Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009) (stressing that "qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the" officer). To avoid a qualified-immunity defense, Blackden must show (1) that Trooper Decker infracted his federal rights and (2) that these rights were so clearly established that a reasonable officer should have known how they applied to the situation at hand. See, e.g., City & Cnty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1774 (2015); Pearson, 555 U.S. at 232; Cortés-Reyes v. Salas-Quintana, 608 F.3d 41, 51-52 (1st Cir. 2010).

We of course may deal with these qualified-immunity steps in any order we please.  See, e.g., Pearson, 555 U.S. at 236.  And today we begin — and end — with the clearly-established step, which requires Blackden to spotlight "controlling authority" or "a robust consensus of cases of persuasive authority" (if there is one) that forbade Trooper Decker from acting as he did.[8]  See, e.g., Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (quotation marks omitted).  Public officials, our judicial superiors tell us, need not be legal savants to win a qualified-immunity case.  See Crawford-El v. Britton, 523 U.S. 574, 590 (1998); cf. generally Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010) (noting that qualified immunity's aim is to "avoid the chilling effect of second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment").  And, they also tell us, judges must

> not . . . define clearly established law at a high level
> of generality.  The general proposition, for example,
> that an unreasonable search or seizure violates the
> Fourth Amendment is of little help in determining

---

[8]  Please note:  because we resolve this case on the clearly-established ground, we express no view on the constitutionality of Trooper Decker's conduct, see Barton v. Clancy, 632 F.3d 9, 12, 30 n.20 (1st Cir. 2011) (taking a similar tack in a qualified-immunity case) — a point so important that we will repeat it again and again throughout this opinion.

- 18 -

> whether the violative nature of particular conduct is
> clearly established.

al-Kidd, 563 U.S. at 742 (citations omitted). Rather, a "more

particularized" inquiry is required. See, e.g., Anderson v.

Creighton, 483 U.S. 635, 640 (1987). That makes sense. Because

"[c]ourts penalize officers for violating bright lines, not" — as

we just said — "for making bad guesses in gray areas," Rivera-

Corraliza, 794 F.3d at 215 (quotation marks omitted), if the

pertinent "legal principles are clearly established only at a level

of generality so high that officials cannot fairly anticipate the

legal consequences of specific actions, then the requisite notice

is lacking," Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir.

2003) (en banc) (opinion of Selya, J.). So "the relevant legal

rights and obligations must be particularized enough that a

reasonable official can be expected to extrapolate from them and

conclude that a certain course of conduct will violate the law."

Id. (citing Saucier, 533 U.S. at 201-02).[9]

The bottom line, then, is that while Blackden need not

show that the complained-about conduct is the spitting image of

---

[9] A sibling circuit nicely explained why it is critically important to define the rights in question at the correct level of generality:

> If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry *always* to answer the clearly established inquiry.

- 19 -

conduct previously deemed unlawful, he must show that the conduct's unlawfulness was "apparent," given preexisting law. See Anderson, 483 U.S. at 640. What that means is that qualified immunity protects Trooper Decker unless Blackden can persuade us that caselaw on the books in August 2010 put the constitutionality of his actions "beyond debate." See al-Kidd, 563 U.S. at 741; see also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (emphasizing that a right is "clearly established" when it is no longer within the "hazy" area of constitutional issues that might be "reasonably misapprehend[ed]" by an officer at the scene (quotation marks omitted)); see generally Morelli, 552 F.3d at 18-19 (discussing how qualified immunity works in a summary-judgment case).

One more important qualified-immunity nugget to keep in mind as we go forward: if an officer consulted with a prosecutor about "the legality of an intended action" — disclosing known info pertinent to that analysis — then his "reliance on emergent advice

---

Precedent demands instead that we go down the stairs of abstraction to a concrete, particularized description of the right. Though not too far down: just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).

Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 508-09 (6th Cir. 2012).

might be relevant . . . to the reasonableness of his later conduct" and so "may help to establish qualified immunity." Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004). As a policy matter, "it makes eminently good sense, when time and circumstances permit, to encourage officers to obtain an informed opinion before charging ahead." Id. But we have cautioned that consultation with "a friendly prosecutor does not automatically guarantee that qualified immunity will follow" and that "the officer's reliance on the prosecutor's advice" must be "objectively reasonable" — *i.e.*, "[r]eliance" will not forestall liability "if an objectively reasonable officer would have cause to believe that the prosecutor's advice was flawed, off point, or otherwise untrustworthy." Id. at 35.

**Applying the Rules**

*The Fourth-Amendment Claim*

Blackden says that Trooper Decker violated his Fourth-Amendment rights by warrantlessly seizing the camera and memory card absent exigent circumstances and that the judge reversibly erred by concluding otherwise. Trooper Decker, unsurprisingly, takes the exact opposite position. We side with the Trooper.

Blackden is right that the Fourth Amendment guards against "unreasonable" searches and seizures. Rivera-Corraliza, 794 F.3d at 215 (quoting U.S. Const. amend. IV). He is also right

- 21 -

that a warrantless search or seizure is "per se unreasonable[] unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971). And he is right that "[t]o show exigent circumstances, the police must reasonably believe that there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant," like "when delay would risk the destruction of evidence" — with our caselaw requiring that the police have "an objectively reasonable basis" for believing that evidence destruction "is likely to occur." See United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005) (quotation marks omitted); see also id. (adding that "[p]roof of exigent circumstances should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects" (quotation marks omitted)); MacDonald v. Town of Eastham, 745 F.3d 8, 13 n.3 (1st Cir. 2014) (highlighting some of Samboy's requirements). On this score, and by way of example, we note Samboy concluded that exigent circumstances permitted a warrantless entry into a suspected drug dealer's apartment because what the officers did — "knocking and announcing their presence" — "gave rise to a reasonable belief" that the

- 22 -

dealer "probably would have realized" that the law was "closing in and begun disposing of the evidence." 433 F.3d at 158-59.

But at step two of the qualified-immunity inquiry we must ask whether Blackden has pinpointed clearly-established law at the time of the seizure that would have stopped a reasonable trooper from thinking exigent circumstances existed "in the situation [he] encountered." See Marrero-Méndez v. Calixto-Rodríguez, 830 F.3d 38, 46 (1st Cir. 2016). And that situation — remember — was this:

- Trooper Decker believed Blackden had violated a number of state laws, giving him probable cause to arrest Blackden — though the Trooper decided not to do that then and there.

- Blackden knew Trooper Decker was investigating him for possible criminal violations, or so the Trooper thought.

- Trooper Decker believed the camera and memory card contained evidence that could help establish Blackden's presence at the scene, which could help prove Blackden had committed a crime.

- Unlike the turnout coat, helmet, or ambulance, the camera and memory could be destroyed in a flash without breaking a sweat — at least that is what the Trooper concluded.

- And Trooper Decker consulted with a prosecutor before taking the camera and memory card.

Blackden thinks he has a case — Menotti v. City of Seattle, 409 F.3d 1113 (9th Cir. 2005) — that clearly establishes the illegality of Trooper Decker's conduct when the underlying events occurred. But this out-of-circuit decision does nothing of the sort.

An issue in Menotti was whether exigent circumstances justified an officer's warrantless seizure of a protestor's sign. Id. at 1153. The court's ruling had three components pertinent to our case. One, the court said that despite having probable cause to arrest the protestor for protesting in a restricted area, the officer made no arrest and so could not seize the sign under the search-incident-to-arrest exception to the warrant requirement — an exception justified in part by the need to prevent an arrestee from destroying evidence. Id. (quoting Knowles v. Iowa, 525 U.S. 113, 116-17 (1998)). Two, because the officer "faced a relatively calm situation" when he crossed paths with the protester — the officer was not "immediately engaged in combating violence" — the court ruled "no exigency requir[ed] seiz[ing]" the sign without a warrant. Id. at 1153-54 (explaining that "the relatively calm situation" meant "the circumstances were not exigent when [the officer] confronted [the protester] and seized the sign"). And three, the court "did not see how" — on the facts of that case — the officer "legitimately could be concerned about a need to preserve evidence of a crime from being destroyed." Id. at 1153.

- 24 -

*Menotti* does not help Blackden's cause.  Yes, like the officer there, Trooper Decker seized an item without making an arrest.  But under *Menotti*, that just means the Trooper cannot rely on the search-incident-to-arrest exception — an exception he does *not* invoke.  And in talking about whether *violence* at the scene triggered exigent circumstances, *Menotti* did not address the type of exigency in our case, described two paragraphs ago — namely (and we say this again as a matter of helpful repetition) that Trooper Decker (a) believed Blackden had broken a bunch of state laws; (b) suspected Blackden knew he had caught the Trooper's eye; (c) concluded Blackden possessed evidence that could help nail him criminally; and (d) thought the evidence could be destroyed with ease before a search warrant could issue.  Also, *Menotti* did not deal with an officer who had consulted with a prosecutor and so says nothing about how such a consultation should affect our qualified-immunity analysis.[10]  And because *Menotti* is little like our case, Blackden has not met his burden of showing that a reasonable trooper — confronted with the facts here — would have known *beyond debate* that he lacked exigent circumstances.

Of course, and to repeat a point made above (but with slightly different words), "a general constitutional rule already

_____

[10] Blackden does not argue that Trooper Decker should not have relied on the prosecutor's approval.

identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." United States v. Lanier, 520 U.S. 259, 271 (1997) (emphasis added) (quotation marks and alterations omitted).  But this is a narrow exception, as the example the Court used shows:  although "[t]here has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery," the Court noted, "it does not follow that if such a case arose, the officials would be immune from damages," id. (quotation marks omitted) — for simplicity, we refer to this as the "slavery hypothetical."[11]  And Blackden makes no persuasive case that the general Fourth-Amendment principles he throws around (excerpted in the second paragraph to this section of this opinion) clearly establish the unlawfulness of Trooper Decker's conduct, like the general principles at play in the slavery hypothetical would for the imagined welfare officials.[12]

---

[11] To eliminate any confusion, we wish to emphasize that the slavery hypothetical discredits the notion that one must have a case on point, but one need not have a case as easily labeled "unconstitutional" as the slavery hypothetical to show a violation of clearly-established law.

[12] Still hoping against hope for a reversal on the Fourth-Amendment ruling, Blackden suggests in a one-sentence footnote to his opening brief that "[a]ny claim by Decker that the preservation of images" amounts to exigent circumstances "is a bit suspect," since he "did not bother to seize" other "potentially incriminating evidence," like "Blackden's vehicle or fire apparel."  But Blackden cites no clearly-established caselaw that would have put the

Let us be crystal clear:  Because we resolve Blackden's Fourth-Amendment claim at the second step of the qualified-immunity test (as we are free to do), we need not say whether Trooper Decker's actions were legal — *i.e.*, we do not say whether exigent circumstances were or were not in play.  Nor need we explore what the precise parameters of the exigent-circumstances exception are or should be.  All we need say is that Blackden has not met his burden of showing that clearly-established law in August 2010 precluded a reasonable trooper from believing the exigent-circumstances exception applied in this situation.  And it is on that basis alone that we affirm the judge's qualified-immunity ruling on this claim.  Cf. generally PDK Labs., Inc. v. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment) (emphasizing the raw truism that "if it is not necessary to decide more, it is necessary not to decide more").

---

Trooper on notice that his not seizing these other items made the camera seizure unlawful.  Nor does he argue that this was so obvious a violation that any reasonable officer would have known about it.  See Marrero–Méndez, 830 F.3d at 47.  So Blackden's footnote suggestion does not cut it.

*The First-Amendment Claim*

The parties agree — or at least do not dispute — that

- "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw," <u>Glik</u> v. <u>Cunniffe</u>, 655 F.3d 78, 82 (1st Cir. 2011) (quotation marks omitted);

- a critical "corollary to this interest . . . is that there is an undoubted right to gather news from any source <u>by means within the law</u>," <u>id.</u> (emphasis added) (quotation marks and alteration omitted) — remember that emphasized phrase;[13] and

- news-gatherers "have no constitutional right of access" to a restricted area "when the general public is excluded," <u>Branzburg</u>, 408 U.S. at 684-85.[14]

But this Kumbaya-like vibe changes when the parties discuss the emphasized phrase from <u>Glik</u> — "by means within the

---

[13] <u>See also</u> <u>Iacobucci</u> v. <u>Boulter</u>, 193 F.3d 14, 25 (1st Cir. 1999) (explaining that because a journalist's "activities were peaceful, not performed in derogation of any law, and done in the exercise of his First Amendment rights," a police officer "lacked the authority" to arrest him for filming officials in the hallway outside a public meeting of a historic-district commission).

[14] <u>See also</u> <u>id.</u> at 684 (adding that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally"); <u>Cohen</u> v. <u>Cowles Media Co.</u>, 501 U.S. 663, 669 (1991) (pointing out "that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects

- 28 -

law."  As Blackden sees it, that Trooper Decker possibly had probable cause to arrest him hardly means that he (Blackden) acted unlawfully when taking the pics at issue — a jury, Blackden writes, could find that he had acted above-board, given that the state "criminal charges against [him] were ultimately dismissed."  And because that is so, his argument continues, Trooper Decker is not qualifiedly immune from suit on the First-Amendment claim — despite what the judge ruled.  Nonsense, says Trooper Decker:  because Blackden (among other things) "gained access to the scene by deceptively operating" a repurposed ambulance "with red flashing lights" — don't forget, Blackden's attorney admitted below that his client was convicted of the red-light violation (turn back to footnote 5) — "Blackden was not acting 'within the law'" and thus the judge rightly resolved the qualified-immunity defense in his favor.  For our part, we see no reversible error either.

At qualified-immunity's second step, Blackden must show that clearly-established law in August 2010 would have put Trooper Decker on clear notice of his potential First-Amendment liability. And regarding the "by means within the law" theory, Blackden points us to nothing that would have put a sensible trooper on notice in

_____

on its ability to gather and report the news"); Asociacion de Periodistas de P.R. v. Mueller, 529 F.3d 52, 58 (1st Cir. 2008) (emphasizing that "[t]he First Amendment does not grant the press a special right of access to property beyond the public domain").

August 2010 that even if he (the trooper) had probable cause to pursue criminal charges against a photographer unauthorizedly in a restricted area and had talked to a prosecutor, he still could not have rationally concluded that the photographer had acted *outside* the law while shooting the photos.[15] More, Blackden gives us no convincing reason to suppose that the pertinent constitutional principles were so particularized back then that Trooper Decker could not have rationally thought he had the legal wiggle room to do as he did — *i.e.*, he presents nothing to persuade us that Trooper Decker's actions, like the actions of the welfare officials in the slavery hypothetical, constitute conduct so egregious that a reasonable official must have known it was unconstitutional.

So that there is no confusion about our holding on the First-Amendment claim: We do not say whether Trooper Decker's actions did or did not violate Blackden's First-Amendment rights. Nor do we say what a complete compendium of First-Amendment rights for news gathers is or should be. We say only that Blackden failed to identify clearly-established law as of August 2010 showing

---

[15] We repeat again what we said in footnote 10: Blackden makes no argument that Trooper Decker should not have relied on the prosecutor's approval.

beyond debate that Trooper Decker's specific acts violated the First Amendment.  And that is that.

### WRAP-UP

For the reasons recorded above, we *affirm* the judgment entered below.